■ JAHI JAMES et al., Respondents, v JAMIE TOWERS HOUSING Co., INC., et al., Appellants. [743 NYS2d 85] —Order, Supreme Court, Bronx County (Bertram Katz, J.), entered February 26, 2001, which, insofar as appealed from, denied the motion for summary judgment by defendant Lance Investigation Service, Inc. (Lance), and further denied, as untimely, the cross motion for summary judgment by defendant Jamie Towers Housing Co., Inc. (Jamie Towers), reversed, on the law, without costs, Lance's motion and Jamie Towers' cross motion granted, and the complaint and all cross claims dismissed. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint as against them.

Defendant Jamie Towers owns a four-building housing complex in the Bronx, for which defendant Lance was the security contractor. On June 9, 1994, the 15-year-old infant plaintiff Jahi James (James) and two of his companions, all residents of the housing complex, were approached on the grounds of the complex by a gang of teenagers. Believing they were about to be robbed, James and his companions, pursued by the gang, ran to one of the buildings in the complex, 2050 Seward Avenue (2050 Seward). James did not live in 2050 Seward, but one of his companions did. James's two companions entered 2050 Seward and allowed the inner glass doors of the building to close behind them before James caught up to them, leaving James, who had no key to the building, standing in the vestibule to the building's entrance, locked outside. The gang caught up with James in the vestibule and assaulted him there. At the time of the assault, the Lance security guard assigned to 2050 Seward was not in its lobby, as he was patrolling the parking lot in back of the building.

The motion court denied Lance's motion for summary judgment based on its acceptance of plaintiffs' contention that Lance's contract with Jamie Towers required that the Lance security guard assigned to each building remain in the lobby of that building unless he was replaced in the lobby by another guard or a supervisor. The motion court apparently reasoned that a jury could reasonably conclude that the absence of any security guard from the lobby of 2050 Seward constituted a negligent failure by Lance to provide security as required by

the contract, and that such negligence was a substantial factor in the causation of James's injuries. We disagree.

The provisions of Lance's contract, insofar as relevant here, provide:

"12.) REGULAR GUARD DUTIES * * *

"c. Guards must maintain their posts in the lobby of the building and at specific times patrol basement, roof, and roof landings, stairways, hallways and parking lots. * * *

"i. All men must remain at their assigned posts. The supervisor will check the men on duty. * * *

"n. The guards shall not leave their posts unless relieved by another guard or supervisor."

Under these contractual provisions, a guard assigned to a building is not required to simply station himself in the building's lobby; rather, the contract also requires him to conduct patrols outside the building and through its various floors. Nothing in these provisions requires a guard to wait to leave the lobby to conduct a required patrol until another guard replaces him in the lobby. Such a requirement arises only if the word "posts" in subparagraphs 12 (i) and (n) is assumed to refer only to the lobbies. There is no reason to make such an assumption, however, since "posts," as used in subparagraphs 12 (i) and (n), can just as readily be construed to refer to a guard's entire round of duties, including the patrols. The word "post" is, after all, defined as, inter alia, "a sentry's beat" (Merriam-Webster's Collegiate Dictionary 909 [10th ed 1998]), which definition directly corresponds to the patrols of the Lance security guards.

Moreover, reading "posts" in subparagraphs 12 (i) and (n) to refer only to the lobbies creates a needless conflict with subparagraph 12 (c), since the priority subparagraphs 12 (i) and (n) would then place on keeping the lobbies continuously guarded is inconsistent with the equal weight subparagraph 12 (c) places on a guard's duty to "maintain [his] post[ ] in the lobby" and his duty to conduct the enumerated patrols "at specific times." As a matter of law, we should adopt the construction of the contract that reasonably harmonizes these provisions and avoids the inconsistency (see, National Conversion Corp. v Cedar Bldg. Corp., 23 NY2d 621, 625; Steadfast Ins. Co. v Sentinel Real Estate Corp., 283 AD2d 44, 51; HSBC Bank USA v National Equity Corp., 279 AD2d 251, 253; Bijan Designer For Men v Fireman's Fund Ins. Co., 264 AD2d 48, 53, lv denied 96 NY2d 707). Accordingly, subparagraphs 12 (i) and (n) should be construed to prohibit a guard's going off duty

before another guard takes his place, not to prohibit a guard's leaving a building's lobby to go on a patrol.

While plaintiffs and the dissent disagree, the untenability of the construction of the contract they advocate is further demonstrated by the contract's "manning schedule." Since the complex has four buildings, the minimum number of on-duty guards necessary to allow continuous guarding of lobbies while guards conduct their required patrols is five (one guard for each of the four buildings, and one additional guard to replace the guard assigned to each building when he leaves the lobby to go on patrol). Under the "manning schedule," however, there were five guards on duty for only six hours per day (6:00 P.M. through 12:00 A.M., the period during which James was assaulted); at all other times, there were either three or four guards on duty. Thus, as plaintiffs and the dissent would have it, subparagraphs 12 (i) and (n) of the contract place an obligation on Lance that another provision of the same contract (the "manning schedule") renders it impossible for Lance to fulfill 75% of the time. Again, these potentially conflicting parts of the contract are easily reconciled by construing the word "posts" in subparagraphs 12 (i) and (n) to refer to the entirety of the guards' rounds of duty, not just their stations in the lobbies.[1]

Under the circumstances presented by this case, "where two seemingly conflicting contract provisions reasonably can be reconciled, [we are] required to do so and to give both effect" (*Bijan Designer For Men v Fireman's Fund Ins. Co.*, 264 AD2d at 53, *supra*, quoting *Proyecfin de Venezuela, S.A. v Banco Indus. de Venezuela, S.A.*, 760 F2d 390, 395-396). Since the alternative reading of the contract advocated by plaintiffs unreasonably creates multiple internal inconsistencies, there is no question of contract construction to be submitted to a jury.

Even if established canons of construction did not require resolving any ambiguity in the contract in Lance's favor, such ambiguity would be resolved in Lance's favor by the uncontradicted and consistent deposition testimony of witnesses for both Jamie Towers and Lance. These witnesses all testified to

---

**1.** Unable to ignore the conflict its reading of the contract creates between the "manning schedule" and subparagraphs 12 (i) and (n), the dissent apparently would resolve the resulting inconsistency by depriving subparagraphs 12 (i) and (n) of any effect whenever less than five guards are on duty, i.e., 18 hours per day. However, nothing in the contract or in the record indicates that subparagraphs 12 (i) and (n) were not intended to apply throughout the entire day. Rather than interpreting the contract to harmonize and give effect to all of its parts, as we are required to do, the dissent simply rewrites the contract to favor plaintiffs.

the understanding that the security guard assigned to each building was not supposed to remain continuously stationed in the building lobby, but was required to periodically patrol the grounds outside the building, including the parking lot, as well as the building's floors. These witnesses further testified that during patrols, the lobbies were left unattended, and that their understanding was that a guard was required to wait for a replacement before taking a break from duty, not that a guard was required to wait for a replacement before leaving the lobby to conduct a patrol. Since the uncontradicted extrinsic evidence allows for only one interpretation of the contract, this evidence would resolve any ambiguity that might otherwise exist as to the contract's meaning.

In view of the foregoing, the fact that there was no guard in the lobby of 2050 Seward at the time of the assault does not support any inference that the Lance security guard assigned to that building was failing to perform his duties as required by Lance's contract. At the time of the assault, the guard assigned to 2050 Seward was patrolling the parking lot in back of the building, which was one of his duties as the guard assigned to that building. The guard had not simply taken a break and left the building and its immediate surroundings unprotected. Since Lance cannot be held liable for the assault absent proof that a failure by its personnel to perform their contractual duties contributed to the occurrence of the incident (*see, Torres v Consolidated Edison Co.*, 258 AD2d 426), Lance's motion for summary judgment should have been granted.[2]

Plaintiffs also argue that the denial of Lance's motion for summary judgment should be affirmed because Lance produced

---

**2.** *Nallan v Helmsley-Spear, Inc.* (50 NY2d 507), apparently cited by the dissent for the proposition that "the failure to remain at a security post in a building lobby constitutes negligence," has little relevance to plaintiffs' claims against Lance. In *Nallan*, the Court of Appeals held, among other things, that the plaintiff had made out a prima facie case of negligence against the defendant owners and operators of the building in which the plaintiff was shot based on evidence that crime from the surrounding area had infiltrated into the building, raising an issue as to whether the defendants had fulfilled their common-law duty as possessors of land to take precautionary measures to minimize the risk to the visiting public. In the instant case, Lance, as an independent security contractor, can only be held liable for failing to provide the level of security required by its contract with Jamie Towers, the landowner (*see, Torres v Consolidated Edison Co., supra*). For similar reasons, *Garrett v Twin Parks Northeast Site 2 Houses* (256 AD2d 224), another case cited by the dissent that deals with a landowner's common-law obligation to take precautions against the reasonably foreseeable risk of criminal attack, does nothing to advance the instant plaintiffs' claims against Lance, whose duty was defined by its contractual undertaking.

a copy of the contract between itself and Jamie Towers from which one or more pages may be missing. This argument is unavailing. Lance represents, without contradiction, that it produced a complete and true copy of the contract in its possession. Plaintiffs waived any right to rely at trial on any purportedly missing portion of the contract by filing a note of issue, and certifying the case as ready for trial, without having obtained such material. We note that plaintiffs first raised this issue in opposing Lance's post-note-of-issue summary judgment motion, having made no inquiry about the purportedly missing portion of the contract at the deposition of any witness from either Lance or Jamie Towers. Moreover, the contract as produced includes provisions dealing with the very matters placed at issue by this action.

Jamie Towers' cross motion for summary judgment also should have been granted. Although Jamie Towers' cross motion was served more than 120 days after the filing of the note of issue (see, CPLR 3212 [a]), the motion court should have considered the cross motion on its merits along with the timely and still-pending motion by Lance to which it responded (see, *Rosa v R.H. Macy Co.*, 272 AD2d 87). On the merits, Jamie Towers was entitled to summary judgment. By contracting with Lance to provide 24-hour security service, and by providing the doors to the buildings with working locks and intercom systems supplemented by video cameras, Jamie Towers certainly discharged, and perhaps exceeded, its duty to take minimal security precautions against reasonably foreseeable criminal acts by third parties (see, *Evans v 141 Condominium Corp.*, 258 AD2d 293, 295). Plaintiffs have made no showing that general neighborhood crime had infiltrated the housing complex so as to require Jamie Towers to provide a higher level of security, or that Jamie Towers voluntarily assumed any such obligation (*id.* at 295-296). Concur—Sullivan, Wallach and Friedman, JJ.

Mazzarelli, J.P., and Rubin, J., dissent in part in a memorandum by Rubin, J., as follows: Between 8:30 and 9:00 P.M. on the evening of June 9, 1994, plaintiff Jahi James, then 15 years old, and two of his friends were accosted by several male teenagers in a park area between two buildings located at 2050 and 2070 Seward Avenue. The buildings are part of Jamie Towers, a four-building apartment complex containing 618 dwelling units, in which the infant plaintiff resided. The group of teenagers chased the three friends into the vestibule of 2050 Seward Avenue, which Jahi was the last to enter. While one of his friends had a key, enabling two of them to escape into the

building lobby, Jahi was trapped by a pair of locked glass doors separating it from the vestibule. In the course of the assault, he sustained contusions and two cuts to the leg, requiring a two-week period of hospitalization.

Its contract with defendant Jamie Towers requires appellant Lance Investigation Service to place four security guards and one supervising officer on duty at the hour Jahi James was attacked. The contract further provides:

"12.) REGULAR GUARD DUTIES * * *

"c. Guards must maintain their posts in the lobby of the building and at specific times patrol basement, roof, and roof landings, stairways, hallways and parking lots. * * *

"i. All men must remain at their assigned posts. The supervisor will check the men on duty. * * *

"n. The guards shall not leave their posts unless relieved by another guard or supervisor."

The liability of appellant Lance Investigation is predicated upon its negligence in failing to adhere to the terms of its contract with the housing complex. It is apparent that no guard was present at the post in the lobby of 2050 Seward Avenue at the time of the assault on Jahi James. The fair import of the duties imposed by the contract is that while the guards were expected to patrol other areas of the complex, they were to do so only "at specific times" and were to "maintain their posts in the lobby" and to leave their posts only if "relieved by another guard or supervisor."

The question of whether the failure to remain at a security post in a building lobby constitutes negligence has already been answered. In a leading case, the Court of Appeals noted that if an attendant with responsibility for security "had been directed by his employers to take such precautionary measures, either expressly or implicitly, [a jury] could have * * * concluded that the attendant's failure to follow his directions in the face of a foreseeable risk constituted negligence that is vicariously attributable to his employers. If, on the other hand, the jury found that no such instructions had been given to the attendant, it could have drawn the conclusion that [the owner and manager] themselves were negligent in not furnishing a full-time attendant to watch the lobby after business hours" (*Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 520 n 9). In view of the explicit directions in the subject contract that "[g]uards must maintain their posts in the lobby of the building" and "guards shall not leave their posts unless relieved," there is a far stronger basis upon which the trier of fact might impose li-

ability on defendant Lance Investigation than was present in *Nallan* (*id.*).

Testimony to the effect that security guards were not expected to remain at their lobby posts continuously is not responsive to inquiry concerning the evening shift in particular. At most, this testimony raises a question of fact as to whether appellant exercised due care in the performance of its contractual obligations; thus, it precludes the grant of summary judgment. As we noted in *Garrett v Twin Parks Northeast Site 2 Houses* (256 AD2d 224, 226), "whether particular precautions are adequate to fulfill the landlord's obligation is almost always a question of fact for the jury based upon the nature of risk presented and the availability of security measures (*Nallan v Helmsley-Spear, Inc.*, *supra*, at 520, n 8; *Carroll v Ar De Realty Corp.*, 167 AD2d 216; *Gilmartin v Helmsley-Spear, Inc.*, 162 AD2d 275; *Loeser v Nathan Hale Gardens*, 73 AD2d 187, 190-191)."

Contrary to the position taken by the majority, there is nothing ambiguous about the terms of the contract as it applies to the facts at bar. Concededly, if there had been an insufficient number of guards on duty to staff the four lobby areas, the provisions of the contract would have been impossible to carry out exactly. However, the contract expressly provides that, between the hours of 6:00 P.M. and midnight, four security guards and one supervising officer will be on duty. It further provides, "The contractor shall not make any alterations of the hours specified herein * * * A failure to adhere to this policy shall be considered a material default of this contract." Thus, in the relevant six-hour period during which the infant plaintiff was attacked, there was nothing to prevent the contract from being performed in exact conformance with its provisions.

Focusing instead on the 18-hour period that is not relevant to this case, the majority undertakes to rewrite the contract to exempt the guards from the duty to "maintain their posts in the lobby of the building," which they "shall not leave * * * unless relieved by another guard or supervisor." Testimony tending to demonstrate that defendant Lance Investigation breached its contractual duty is employed to conform the language of the contract to defendant's actual practice. This is accomplished through the artifice of recasting, under the guise of interpretation, the meaning of "posts"—specifically, "posts in the lobby of the building"—so as to encompass "patrols outside the building and through its various floors."

Rather than read the material provisions of the contract in the context of the document as a whole, the majority simply

embraces the meaning of "post" that supports its interpretation. However, resort to the dictionary only confirms the intrinsic uncertainty of the term, which is variously defined as "a station or position to which a person is assigned"; "the place at which a soldier is stationed"; and "the fixed locality or stretch of ground guarded or patrolled by a sentry or outpost" (Webster's Third New International Dictionary of the English Language [1993]). The contract, however, refers to the terms "post" and "patrol" in the alternative, making reference to the need for orientation of a guard "to his/her intended post *and* patrol area" (emphasis added), thereby drawing a distinction between the fixed station and a roving patrol. Whatever meaning is ascribed to "post" in the abstract, a post "in the lobby of the building" cannot extend beyond the lobby of the building.

While striving mightily to avoid it, the majority's argument leads inexorably to the conclusion that the contract is ambiguous, at least with respect to those shifts that are *not* material to the time of the assault upon Jahi James. If only three guards are scheduled for duty, as is the case between 2:00 A.M. and 4:00 P.M., a contractual requirement to maintain posts in each of the lobbies of the four buildings in the apartment complex is impossible to carry out. However, the inherent conflict created by staffing levels insufficient to permit literal compliance with the contract at all times serves only to raise a question of fact requiring resolution at trial (*Eden Music Corp. v Times Sq. Music Publs. Co.*, 127 AD2d 161, 164). A court is not permitted to resolve, as a matter of law, an ambiguity in a contract by resort to extrinsic evidence. Where "determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury" (*Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 172).

Any suggestion that the failure to maintain a guard on duty in the lobby could not have been a proximate cause of the infant plaintiff's injuries is without foundation in law and requires the resolution of factual questions in favor of appellant. The primary reason for providing lobby security is to prevent unauthorized entry (*see, e.g.*, *Chianese v Meier*, 246 AD2d 328, *lv dismissed* 92 NY2d 876; *Garrett v Twin Parks Northeast Site 2 Houses*, *supra*; *Melville v New York City Hous. Auth.*, 242 AD2d 244). It would be disingenuous to argue that a lobby guard does not have a duty to keep the building entrance under observation, or that a guard would not have had a clear view of the vestibule through the twin glass doors separating it from

the lobby. Nor can it be said that the infant plaintiff, a tenant of the apartment complex, is not within the class of persons for whose protection the security measures were implemented. The assault upon a tenant is clearly a foreseeable hazard that security services are intended to deter and that directly results from a lapse in such measures. The duty undertaken by appellant requires that it anticipate and provide protection against intervening misconduct; thus, its occurrence does not afford a basis for avoiding liability for a breach of that duty (*Rosario v City of New York*, 157 AD2d 467, 469-470).

Although the cross motion of Jamie Towers was served more than 120 days after the filing of the note of issue, it should have been considered along with the motion in chief, which was both timely and still pending (*see, Rosa v R.H. Macy Co.*, 272 AD2d 87). In any event, even in the absence of a cross motion, this Court could search the record and grant summary judgment in favor of Jamie Towers (*see, A.C. Transp. v Board of Educ.*, 253 AD2d 330, 338, *lv denied* 93 NY2d 808). No triable issues of fact are raised as to whether Jamie Towers discharged its duty to take "minimal" precautions to protect tenants from reasonably foreseeable criminal acts (*see, Miller v State of New York*, 62 NY2d 506, 513). "The landlord has no duty to safeguard tenants from neighborhood crime as such. The duty to protect against criminal intruders only arises when ambient crime has seriously infiltrated the premises or when the landlord is on notice of a serious risk of such infiltration" (*Evans v 141 Condominium Corp.*, 258 AD2d 293, 295, citing *Todorovich v Columbia Univ.*, 245 AD2d 45, 46, *lv denied* 92 NY2d 805).

The record contains no evidence that general neighborhood crime had infiltrated the Jamie Towers building complex. Plaintiffs' expert's report alluded only to crime statistics in the 43rd Precinct where Jamie Towers is located but made no specific reference to crimes in the complex itself. The infant plaintiff testified that he had never before been chased or attacked on the grounds of Jamie Towers, nor had he heard of anyone being attacked. His father had heard about two homicides in the 30-plus years he had lived in Jamie Towers but could not provide any details, and the record otherwise provides no basis for finding that the assault on plaintiff was foreseeable (*see, Novikova v Greenbriar Owners Corp.*, 258 AD2d 149, 152-153; *Evans v 141 Condominium Corp.*, *supra* at 294). Nor is there any record support for plaintiffs' claim that Jamie Towers assumed an obligation to provide a higher level of security beyond the minimal precautions required under the

common law (*see, Evans v 141 Condominium Corp., supra* at 295-296, distinguishing *Nallan v Helmsley-Spear, Inc., supra*). Jamie Towers discharged its duty to provide minimal security precautions by contracting with Lance Investigation to provide 24-hour security service and by providing inner doors to the vestibule that were kept locked and, further, by providing an intercom system in the vestibule connected to video cameras in the tenants' apartments (*cf., Anzalone v Pan-Am Equities,* 271 AD2d 307, 309; *Evans v 141 Condominium Corp., supra* at 295, citing *Todorovich v Columbia Univ., supra* at 47).

Accordingly, the order should be modified to the extent of dismissing the complaint and cross claims as against defendant Jamie Towers and, except as so modified, affirmed.