■ GESSIN ELECTRICAL CONTRACTORS, INC., Respondent, v 95 WALL ASSOCIATES, LLC, Appellant, et al., Defendants. [903 NYS2d 26]—

---

Order, Supreme Court, New York County (James A. Yates, J.), entered October 16, 2009, which declared null and void the agreement between plaintiff and defendant 95 Wall Associates, dated September 22, 2008, and denied said defendant's motion for summary judgment dismissing the complaint as against it and for judgment on its counterclaim, unanimously affirmed, with costs.

This action involves a claim for approximately $1.7 million in change orders that plaintiff, a contractor on a construction project, submitted to 95 Wall, the premises owner.

At a September 2008 meeting, attended by 95 Wall's chief financial officer, Joseph Moinian, and plaintiff's principals, David Wasserman and Cory Gessin, the parties, without counsel, agreed to resolve the dispute by having 95 Wall pay plaintiff $500,000. However, 95 Wall did not realize that about $1.09 million of plaintiff's claim had already been satisfied by payments from the general contractor. Accordingly, 95 Wall thought it was settling the full $1.7 million claim for $500,000, and plaintiff thought it was settling a $580,000 balance for $500,000.

After the meeting, 95 Wall's in house counsel drafted a one-page agreement that provided in relevant part:

"1. Owner and Contractor agree to value all change orders and extras . . . arising from the date of the inception of the Contract at the sum of $500,000 (the "Extra Amount").

"2. Owner shall pay the Extra Amount as follows: (a) Owner shall make four payments of $75,000.00 each on a weekly basis. Contractor acknowledges receipt of 2 payments of $75,000.00 under this Agreement. The remaining weekly payments shall be paid on the date of full execution of this Agreement and on the same day in the following week; (b) Owner shall make four payments of $50,000.00, on the first business day of each month, commencing November 3, 2008 and on the first business day of each succeeding month thereafter."

The agreement also provided that plaintiff would not file any mechanic's lien as long as 95 Wall was not in breach, that lien waivers would be executed and held in escrow until each payment cleared, and that plaintiff would receive an additional $350,000 as a credit for certain rebates. Plaintiff signed the agreement without the benefit of counsel.

After 95 Wall paid the first $450,000 due under the agree-

ment, it realized that it had already paid $1 million for change orders and took the position that plaintiff had been overpaid. When 95 Wall refused to make any further payments, plaintiff filed a mechanic's lien for $555,237 and brought this action to enforce it. 95 Wall answered, counterclaimed for a $493,603 alleged overpayment, and moved for summary judgment.

The motion court directed an evidentiary hearing on the issue of what the parties intended and understood their agreement to be. After hearing testimony, the court, noting that the agreement had been drafted by an attorney who had not attended the negotiation session, found that

"[t]he future payment schedule was because [plaintiff's principal] thought he was owed the money and that was the payment schedule for the money he thought he was owed.

"There is no theft or fraud here, it is just a payment schedule of a settlement of what he thought he was, what he was owed.

"On the other hand, I agree [95 Wall's principal] just probably was totally unaware of what . . . 95 Wall had paid out in total. . . .

"I conclude there was no meeting of the minds. I credit that Gessin thought he was settling the 580 thousand dollar claim for 500 thousand dollars. And I credit Mr. Moinian when he says he thought he was paying eight point two million [the contract price] plus 500 thousand and that was it."

Accordingly, the court denied 95 Wall's summary judgment motion and declared the contract null and void.

The courts should construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms (*James v Jamie Towers Hous. Co.*, 294 AD2d 268, 269 [2002]). Where internal inconsistencies in a contract point to ambiguity, extrinsic evidence is admissible to determine the parties' intent (*see Federal Ins. Co. v Americas Ins. Co.*, 258 AD2d 39, 43 [1999]). The ultimate aim is to realize the parties' "reasonable expectations" through a practical interpretation of the contract language (*see Sutton v East Riv. Sav. Bank*, 55 NY2d 550, 555 [1982]). Even if parties intend to be bound by a contract, it is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently (*see Brands v Urban*, 182 AD2d 287 [1992]; *see also McNamara v Tourneau, Inc.*, 464 F Supp 2d 232, 238 [SD NY 2006]).

Here, although paragraph 1 of the settlement agreement values all change orders arising from the date of the inception of the underlying contract at $500,000, paragraph 2 provides that plaintiff will be paid $500,000 on specified future dates,

and paragraph 5 adds $350,000 more in rebates, which demonstrates that plaintiff never intended to return over $400,000 to 95 Wall; there was no meeting of the minds on this material term.

In *Computer Assoc. Intl., Inc. v U.S. Balloon Mfg. Co., Inc.* (10 AD3d 699 [2004]), the buyer's witness established that the buyer understood the computer software "service pack" addendum to the parties' contract included all the educational services he and his employees would need to use the software. When, shortly after contract execution, the seller tried to sell a separate education package at additional cost, the buyer sought to rescind the contract. In direct conflict with this testimony, the seller's witnesses established that they understood that educational services were not included in the contract price, but were to be included in a separate agreement. The Second Department found the language employed in the contract was not susceptible of only one meaning, and thus the contract was ambiguous as a matter of law. There was a reasonable basis for the parties' difference of opinion as to what the contract included or did not include, and thus the contract was unenforceable for lack of a meeting of the minds regarding a material element.

Similarly, in this case the motion court found that

"[i]t would not have made sense for [Gessin's principal] to sign an agreement that says oh, I value all change orders, one point seven million dollars worth of change orders for 500 thousand, even though you already paid me 900 thousand dollars . . .

"I do not think when he signed it, that is the way that he read that paragraph, and I do not think . . . this is the kind of paragraph that is so crystal clear to Mr. Gessin in his situation at that time that he was consciously agreeing to instead of getting 580 thousand dollars, instead he was agreeing to give back 400 thousand."

95 Wall contends that the contract must be enforced because it reflects its understanding of the parties' agreement. But while it may have reflected 95 Wall's understanding insofar as it purported to settle "all change orders" for $500,000, 95 Wall ignores the contract provision stating that it would make future payments even though it had already paid plaintiff far more than $500,000. In effect, 95 Wall asks this Court to read the future payment provision out of the contract, but doing so would depart from the well-settled rule of construction that no provision of a contract should be left without force and effect (*see Corhill Corp. v S.D. Plants, Inc.*, 9 NY2d 595, 599 [1961]; *see*

*also Acme Supply Co., Ltd. v City of New York*, 39 AD3d 331 [2007], *lv denied* 12 NY3d 701 [2009]). As the motion court determined as the finder of fact, 95 Wall believed that the parties were settling about $1.75 million worth of claims for a total of $500,000, and plaintiff believed that 95 Wall had agreed to pay it an additional $500,000 to settle its remaining claims. The written contract does not reflect either party's understanding.

Moreover, a court sitting in equity can rescind a contract for unilateral mistake if failure to rescind would unjustly enrich one party at the other's expense, and the parties can be returned to the status quo ante without prejudice (*Cox v Lehman Bros., Inc.*, 15 AD3d 239 [2005]; *see also Rosenblum v Manufacturers Trust Co.*, 270 NY 79, 84-85 [1936]). In *Cox*, the plaintiff maintained a margin account with the defendant broker, which was secured by stock in the account. The parties stipulated that the broker would return 112,400 stock shares upon the plaintiff's payment of $60,000. After the plaintiff paid the money, the broker discovered there were only 81,700 shares in the account. The plaintiff sued to enforce the stipulation, but the trial court directed judgment for the broker on its counterclaim to rescind the stipulation. We affirmed, holding that enforcing the stipulation as written, by requiring the broker to purchase 30,700 shares on the market to give to the plaintiff (in addition to the 81,700 shares from the account) would create "a windfall" for the plaintiff. We noted that during the parties' settlement negotiations, the plaintiff never asked for more shares than were in the margin account, and that we saw "no indications that [the broker] lacked good faith or intentionally avoided making an inquiry it had reason to know would disclose the true facts" (15 AD3d at 240). Moreover, we concluded, rescinding the stipulation would restore the status quo ante.

Here, if 95 Wall's interpretation were accepted, i.e. that $1.7 million in change orders were settled for $500,000, 95 Wall would be unjustly enriched in that undisputedly plaintiff did not intend those terms. On the other hand, if plaintiff's interpretation were accepted, it would require 95 Wall to pay plaintiff about $1 million more than 95 Wall had intended. Under these circumstances, rescinding the contract restores the status quo ante, where 95 Wall has already paid plaintiff on some of its claims, and the remaining claims are outstanding.

Accordingly, the motion court correctly determined that the written contract should be voided. Concur—Andrias, J.P., Saxe, Sweeny, Freedman and Román, JJ.