(March 20, 2012)

■ JASMINE ZHENG et al., Appellants, v CITY OF NEW YORK et al., Respondents. [940 NYS2d 582]—

Order and judgment (one paper), Supreme Court, New York County (Judith J. Gische, J.), entered October 6, 2011, after a nonjury trial, dismissing the causes of action for specific performance, injunction and deprivation of due process, and declaring that defendants are not contractually obligated to continue making rent subsidy payments under the Advantage Program, affirmed, without costs.

In this action for specific performance, and declaratory and

injunctive relief, plaintiffs seek to bar termination of a rent subsidy program run by the NYC Department of Homeless Services even though federal and state funding was withdrawn effective April 2011. Plaintiffs argue that the various documents appertaining to the subsidy program (Certification Letters, Participation Agreements and Lease Riders) contractually obligate the City to continue the subsidies.

We sympathize with plaintiffs and recognize that an adverse outcome could place them at risk of again ending up in the New York City emergency shelters for the homeless and battered women—a system undoubtedly already overcrowded and overburdened. Unfortunately, this cannot constitute a valid reason to reverse the trial court's determination because we are constrained to apply cardinal principles governing the construction of contracts to the course of conduct and communications between the parties. Accordingly, we find that the trial court correctly found that the Advantage rent subsidy program for the homeless was simply a social services program, and that defendants did not intend to be bound contractually.

*Brown Bros. Elec. Contrs. v Beam Constr. Corp.* (41 NY2d 397, 399 [1977]) reiterates the rule applicable here that the existence of a binding contract is not dependent on the subjective intent of the parties, but on the objective manifestations of intent. *Brown Bros.* cautions that, in seeking a practical interpretation of the expression of the parties, disproportionate emphasis should not be placed on any single act, phrase or other expression, but on their totality given the attendant circumstances, the situation of the parties and the objectives they were striving to obtain (*see also Four Seasons Hotels v Vinnik*, 127 AD2d 310, 317 [1987]). Although the question of contractual intent is essentially factual in nature, this does not mean that a court is obliged to accept at face value every conclusory assertion of fact regarding intent (*id.* at 318).

Here, plaintiffs and the dissent place undue emphasis on the trappings of contract language such as "guarantee" or "will pay," construing them as legal promises rather than mere assurances; it was reasonable to understand "guarantee" as defendants do, as intending to allay fears that rents would not be paid in the absence of public assistance, as had often happened under previous subsidy programs. Plaintiffs and the dissent also rely too heavily on the signing procedure, which was meant to accomplish no more than ensure that participants were aware of the terms of the program.

Accordingly, the dissent's analysis of the course of conduct and communications between the parties suffers from one

fundamental flaw. Even if the tenant participants and the landlords intended to be contractually bound, there is no enforceable contract in either instance because defendants profess to have understood the documents differently with respect to their basic material nature, i.e., that the City was undertaking a governmental social services obligation that was within its discretion to terminate rather than a contractual obligation; there was no meeting of the minds (*cf. Gessin Elec. Contrs., Inc. v 95 Wall Assoc., LLC*, 74 AD3d 516, 518 [2010] [no contract if parties have differing understanding of a material term]).

Ultimately, as the court properly found at the nonjury trial, all of the surrounding circumstances lead to the ineluctable conclusion that the Advantage program was a social service program no different from any other, and not a contractual obligation undertaken by government. Absent a contract, there is no merit to plaintiffs' contention that the City is required to grant a second year of rent subsidies if participants meet previously established criteria.

Absent a contractual meeting of the minds, it is unnecessary to address the parties' arguments regarding the existence of consideration for plaintiffs' becoming participants in the Advantage program. In any event, contrary to the dissent's suggestions, it is a fundamental principle of contract law that a promise to perform an existing obligation is not valid consideration (*see Goncalves v Regent Intl. Hotels*, 58 NY2d 206, 220 [1983]; *Nam Tai Elecs., Inc. v UBS PaineWebber Inc.*, 46 AD3d 486, 487 [2007]). Pursuant to 18 NYCRR 352.35, plaintiffs were obligated to cooperate and accept the housing offered by the Advantage program (*see McCain v Giuliani*, 252 AD2d 461 [1998], *lv dismissed* 93 NY2d 848 [1999]). Thus, their claim of providing consideration by suffering the detriment of leaving shelters and of leasing apartments that cost more than they could afford is also without merit. Concur—Gonzalez, P.J., Sweeny, Renwick and Richter, JJ.

Moskowitz, J., dissents in a memorandum as follows: Plaintiffs are a class of formerly homeless families and individuals for whom the City paid rent through a program called Advantage. The City induced these plaintiffs, many of whom are victims of domestic violence, to leave the relative safety of the shelter system and to enter into leases for apartments they could not afford. The City accomplished this by agreeing to pay all or a portion of plaintiffs' rent for a year with the promise of a second year if they met the eligibility requirements for the Advantage program. However, once plaintiffs took the City up on its offer and moved, the City terminated that funding during the lease term.

The trial court refused to hold the City liable for the remaining rent. The trial court held that the Advantage program was merely a social benefit program that the City had a right to terminate. However, as the trial court recognized, the City can, and often does, implement a social benefit program through enforceable contracts.

Here, the City did implement the Advantage program through enforceable contracts. The City clearly agreed to pay plaintiffs' rent in return for plaintiffs' leaving the shelter system. The City also agreed to pay rent so the landlords would provide housing for the Advantage program. These bargained for exchanges support the existence of a contract, primarily between the participants and the City, but also between the landlords and the City. Thus, because the City agreed to be bound, and, because plaintiffs, by vacating the domestic violence shelter system, and landlords, by supplying apartments, provided consideration for that agreement, I dissent.

The following facts are undisputed or are from the findings of fact the trial court adopted. In February 2007, the New York City Department of Homeless Services (DHS) proposed the Advantage program, whereby it would provide rent subsidies to shelter residents who meet public assistance requirements and work at least 20 hours per week at minimum wage or above. In May 2010, DHS amended the program to increase participants' work and financial contribution requirements.

When homeless families became eligible to participate in Advantage, the City issued them a Certification Letter setting forth the terms of the program and providing that the program "*guarantees* that the subsidy portion of the rent will be paid directly to your landlord for one year. You *may* receive a second year of rental assistance under Advantage if you meet the eligibility criteria for a second year" (emphases added). Those eligible for Advantage were expected to seek suitable apartments, with the loss of shelter eligibility as a possible sanction if they failed to do so. However, as the trial court found, "[t]he Advantage Tenants were not under a legal duty to rent Advantage apartments they could not afford, and they could not have been sanctioned for refusing an apartment they could not afford."

In addition, Advantage participants were often required to sign a Participant Statement of Understanding, that the City drafted and a DHS representative witnessed and signed. Right above the signature line for DHS, the Participant Statement refers to itself as "this agreement." The Participant Statement also provides that "[u]nder the Advantage program, the City of

New York *will* pay a portion of my monthly rent (over and above my family's monthly rent contribution) directly to my [l]andlord (emphasis added)." It further states that if the City finds a participant eligible for a second year, "the City *will* pay a second year of Advantage Rent Payment to [the] Landlord on a monthly basis" (emphasis added).

When an Advantage participant signed a lease with a private landlord, the participant, the landlord and a DHS representative (as witness) signed a rider. In the rider, the participant authorized the City to pay the Advantage portion directly to the landlord. In addition, the lease riders state that the rent "must" be paid once a month. It is undisputed that the City drafted the lease riders.

On March 17, 2011, apparently because the State of New York cut off funding for the Advantage program, defendants announced that, as of April 1, 2011, the City would not continue to pay rents. This lawsuit followed on March 28, 2011. On June 2, 2011, after Supreme Court denied plaintiffs' motion for a preliminary injunction, we granted plaintiffs' motion for relief pending appeal, and ordered defendants to continue to make payments under the Advantage program. On September 13, 2011, the trial court rendered its decision after trial. The trial court found that the Advantage program was nothing more than a social benefit program that the City had a right to terminate based on lack of funding. On February 2, 2012, this Court dismissed the appeal from the denial of plaintiffs' motion for a preliminary injunction, dissolved the stay that was in place and denied the motion for consolidation with this appeal and for a continued stay (*Zheng v City of New York*, 92 AD3d 412 [2012]). On February 16, 2012, this Court, over my dissent, denied plaintiffs' motion for a stay pending appeal from the judgment (*Zheng v City of New York*, 2012 NY Slip Op 64817[U] [2012]).

To demonstrate the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, mutual assent and an intent to be bound (*Silber v New York Life Ins. Co.*, 92 AD3d 436 [1st Dept 2012] ["(c)ourts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract"]). The mutual assent must include agreement on all essential terms (*Kowalchuk v Stroup*, 61 AD3d 118, 121 [2009]). A contract must also have the support of consideration (*Brearton v De Witt*, 252 NY 495 [1930]). The trial court found mutual assent and consideration to be lacking.

I disagree. First, there is a contract between the City and the Advantage participants by virtue of the Certification Letter, the Participant Statements and the riders to the leases through which the City agreed to pay plaintiffs' rent for two years. To manifest mutual assent, there needs to be an offer and acceptance of that offer, along with an arrangement embodying definite essential terms (*Gui's Lbr. & Home Ctr., Inc. v Mader Constr. Co., Inc.*, 13 AD3d 1096 [2004], *lv dismissed* 5 NY3d 842 [2005]). Here, the Certification Letter clearly represented an offer. In it, the City stated that the "Advantage program *guarantees* that the subsidy portion of the rent will be paid" and that participants would be entitled to a second year provided they met eligibility requirements for the program. An individual plaintiff accepted that offer when it signed the lease rider and the Participant Statement. The language in the Participant Statements, the lease riders and the surrounding circumstances demonstrate the City's intent to bind itself to this arrangement. With respect to the surrounding circumstances, the City and the program participant signed the Participant Statements at the same time they signed the leases and defendants required the final lease signing to be at defendants' offices under defendants' supervision. The trial court also found that "[i]n both internal and external communications, Defendants have referred to themselves as a party to the Advantage leases." More important, the City drafted and signed the Participation Statement and chose to denominate it an "agreement." In the Participant Statement, the City bound itself when it agreed it "will pay" a portion of the monthly rent for one year and a second year on a monthly basis, subject to participant eligibility. These lease riders, that authorized partial payment or rent from the City, provided that the rent "must" be paid and provided for a City representative to sign as a witness, effectuated the City's promise to pay and placed an affirmative obligation on the City to fund the specific Advantage portion the particular lease addressed. The City's obligations for the second year were dependent upon plaintiff's eligibility to remain in the program and nothing else. It is undisputed that most, if not all, of the participants meet, or have already met, the eligibility requirements.

The use of the word "may" in relation to the second year of rent subsidies does not refer to the City's discretion to permit a second year of funding. Rather, read in context with phrase "if you meet the eligibility criteria for the second year" the word "may" clearly refers to the Advantage participants meeting the criteria for the program, such as the income ceiling. As the trial court found, nowhere in the Participant Statement or the lease

riders did defendants condition the City's obligation to pay on the City's fiscal condition or on state or federal funding ("Nothing in the Advantage program documents or public informational materials authorizes Defendants to terminate Advantage payments in the middle of an Advantage lease term because of lack of funding"). Thus, the Participant Statement and the leases contained all the essential terms necessary to carry out the agreement, namely that the City would pay a sum certain directly to the landlord once per month and the participants would move out of the shelter and into an apartment.

Contrary to the decision of the trial court, it is clear plaintiffs provided consideration to support the contract. The City admits that it has a legal obligation to provide shelter to the homeless (*see Boston v City of New York*, Sup Ct, NY County, Dec. 12, 2008, index No. 402295/08 [homeless families]; *Callhan v Carey*, Sup Ct, NY County, index No. 42582/79; *Eldredge v Koch*, Sup Ct, NY County, index No. 41494/82 [homeless individuals]), and the trial court observed that "[h]omeless families and individuals who left [d]efendants' shelters to move into private, permanent housing as Advantage [t]enants relieved [d]efendants of their obligation to provide them with housing in the shelter system under the *Boston* final judgment and the rulings and orders in *Callahan* and *Eldredge*."

Moreover, the City admits that it is cheaper to fund Advantage than to house plaintiffs in the shelters. In a letter to Elizabeth Berlin, the Executive Deputy Commissioner for the New York State Office of Temporary and Disability Assistance, protesting the cuts to the Advantage program, Robert Doar, the Commissioner of the Human Resources Administration for the City of New York and Seth Diamond, the Commissioner for the City's Department of Homeless Services, stated that terminating Advantage "will cost the City and State more money than is currently spent on the subsidy. Specifically, there will be a substantial increase in shelter costs, which we estimate to be $133 million." Further, as the court noted, "[W]hen Advantage recipients left shelters and entered into private apartments, the requirement to provide services pursuant to such State regulation ceased."

A cost savings of $133 million to carry out an existing legal obligation is certainly sufficient consideration (*see e.g. Elfenbein v Luckenbach Terms., Inc.*, 111 NJL 67, 72, 166 A 91, 93 [1933] [consideration adequate where there "would have been no saving had defendant not acted"]). That the state may or may not pick up much of this $133 million after the fact is of no moment. Any cost savings to the City may serve as consideration

(*see Mencher v Weiss*, 306 NY 1, 8 [1953] ["the law does not weigh the quantum of consideration . . . The slightest consideration is sufficient to support the most onerous obligation"] [internal quotation marks omitted]).

The City argues that plaintiffs had a legal obligation to seek housing anyway and that a preexisting legal obligation cannot serve as consideration. The majority buys into this argument. However, this argument is a red herring. As the trial court found, plaintiffs had no preexisting obligation to move into apartments they could not afford on their own. Nor did plaintiffs have an obligation to place themselves in a worse situation than they were before. Rather, as the trial court found, "All Advantage Tenants, even if [d]efendants promised to cover their entire rent payment, had to enter into leases with their landlords and thereby incur a new legal obligation" and "[w]hen the Advantage Tenants moved out of shelter to enter Advantage leases, they legally bound themselves to leases they could not afford on their own." It is black letter law that, a new, as opposed to an existing, legal obligation can serve as consideration (*see Weiss v Weiss*, 266 App Div 795 [1943] ["(p)erformance by a promisee of an act which he is not obligated to perform, or the surrender by him of a privilege which he has the legal right to assert, is sufficient consideration for a promise, since it is a legal detriment, irrespective of whether it is an actual detriment or loss to him"]).

Moreover, there was an agreement between the City and the landlords to which plaintiffs were third-party beneficiaries.* Unlike the arrangement between the City and the participants, the trial court did not rule that the contract between the City and the landlords was invalid due to lack of consideration. Rather, the trial court found no mutuality of assent between the landlords and the City. This was error. The overwhelming weight of the evidence supported a finding that the City and the landlords provided their mutual assent to contract through the process of offer and acceptance. Viewed objectively as we must (*see TAJ Intl. Corp. v Bashian & Sons*, 251 AD2d 98, 100 [1998]), the words that the City chose to use in the Advantage program documents and materials: "guarantees," "shall pay" "will pay" "will issue" "assures" and "commitment" demonstrate an intent to bind oneself contractually.

First, the Certification Letters suggested that participants show the letter to landlords during an apartment search. These letters stated that the City "*guarantees* that the subsidy portion

---

* The City does not dispute that, if it entered into contracts with the landlords, plaintiffs would be third-party beneficiaries to those contracts.

of the rent will be paid directly to your landlord" (emphasis added). The Participant Statements, that participants and the City signed at the same time as the leases, contained the assurance that the City "will pay the Advantage Rent Payment directly to [a participant's] Landlord on a monthly basis." More important, the Landlords' Statements of Understanding, that the City drafted, state that "[u]nder the Advantage Program, the City . . . will pay directly to me, the Landlord, monthly rent . . . for a period of one year, on behalf of the eligible Advantage client." The DHS Advantage Rental Assistance Program Brochure states "Work Advantage . . . assures landlords of monthly rent payments with no payment disruptions." Finally, the lease riders themselves state "The City shall pay the Program Tenant's rent directly to the [l]andlord." A clearer indication of assent to guarantee rent payment would be hard to imagine.

The trial court was also incorrect in finding that the landlords did not manifest assent. The terms in the documents that the City required the landlords to sign unequivocally demonstrate the landlord's intent to bind themselves contractually. For example, in the Landlord Statement of Understanding, the landlords stated, "I understand that if the Program tenant leaves the [a]partment due to an eviction or move, I, the [l]andlord, will return any pre-paid Advantage Rent Payments to the City, or, if the City elects this option, allow another Advantage client to reside in the [a]partment for the remainder of the [l]ease term." Thus, in exchange for guaranteed rental payments, the landlords actually ceded control over who could reside in their apartments. Also, in the Landlord Statements, the landlords demonstrated their commitment to rent for a second year: "I understand that the Program Tenant is automatically entitled to a self-executing renewal of the Lease for a second year at the same rent provided for in this Rider, provided that (a) Program Tenant has been found eligible by the City for a second year of the Advantage Program." Like many contracts, the lease riders contain a set-off provision should the landlords default on any of their responsibilities: "The Landlord acknowledges and agrees that in the event that the Landlord is in default of any obligation to the City of New York, DHS may withhold for the purpose of set-off, all or a portion . . . of the Rent payment." In the lease riders, the landlords also agreed that they "shall not demand, request, or receive any payments or other consideration from Program Tenant . . . beyond that authorized in the [l]ease and this Rider." Thus, there was an agreement between the City and the landlords whereby the landlords agreed to forgo certain rights in exchange for guaranteed rental payments for one to two years. The commit-

ments the landlords made certainly demonstrate intent to be contractually bound. This exchange of promises is a textbook example of mutual assent.

Accordingly, there was clearly a contract between the Advantage participants and the City. There was also a contract between the City and the landlords. Taking an objective view of the evidence, one can only conclude that the City assented to this arrangement. As a matter of law, there was consideration to support these contracts. Now, because the City breached its contractual obligations, the landlords face the expense of eviction proceedings in court and nonreceipt of rent. Plaintiffs are now potentially liable for the balance of leases they cannot afford. They are also in an untenable situation whereby they face eviction and homelessness. Many Advantage participants are victims of domestic violence. They will not be eligible to return to the relative safety of the domestic violence shelter system unless they suffer new incidents of domestic violence. If they do suffer further domestic violence, the domestic violence shelters may not have room as they are always at capacity. Plaintiffs will likely go into the homeless shelter system where they will not receive the protections they need to avoid their abusers. Or, they may be forced to return to the dangerous homes they sought to escape in the first place. Some may simply take to the streets.

