## Moghtaderi v Apis Capital Advisors, LLC

2024 NY Slip Op 32339(U)

July 8, 2024

Supreme Court, New York County

Docket Number: Index No. 650287/2020

Judge: Melissa A. Crane

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:   **HON. MELISSA A. CRANE**                      PART _____ 60M _____
                                                 *Justice*
-----------------------------------------------------------------------X

KAMRAN MOGHTADERI,                               **INDEX NO.** _____650287/2020_____

                          Plaintiff,

                  - v -

APIS CAPITAL ADVISORS, LLC, DEKI CAPITAL GP,     **DECISION AFTER TRIAL**
LLC, ERIC C ALMERAZ, DANIEL J BARKER,

                          Defendant.

-----------------------------------------------------------------------X

Hon. Melissa A. Crane, J.S.C.

The court held a two-day bench trial in this matter commencing March 4, 2024. The issue was simple: did the parties intend to deduct customary operating expenses when calculating the withdrawal payment of a withdrawing partner in the Third Amended and Restated Operating Agreement dated May 7, 2015 (the "Operating Agreement"). Plaintiff would have us believe the parties did not intend to deduct customary operating expenses. Defendant contends they did.

Previously, on May 12, 2022, the Appellate Division, First Department held that the Operating Agreement contained an ambiguity. Specifically, in determining "Excess Net Income" Section 1.09 of Addendum B calculates as follows: "the aggregate Current Fees received by Apis and Deki for such Fiscal Year, **less** the aggregate customary operating expenses related to such Current Fees, **minus** the Income Hurdle rate for such Fiscal Year" (emphasis added). Thus, under Section 1.09 both customary operating expenses AND the Income Hurdle rate are subtracted from the Excess Net Income in which a withdrawing partner would be entitled to share.

# OTHER ORDER – NON-MOTION

[* 1]

However, Schedule E, a spreadsheet that was supposed to provide example calculations, and is merely an attachment in another part of the Operating Agreement, only subtracts the aggregate amount of "Current Fees" and the Income Hurdle Rate. Schedule E contains nothing about subtracting "Customary Operating Expenses." The Appellate Division found the inclusion of Schedule E created an ambiguity with the rest of the agreement (*Moghtaderi v Apis Capital Advisors*, 205 AD3d 504, 505 [1st Dept 2022]). Accordingly, this court held a bench trial to resolve the ambiguity.

The only place in the Operating Agreement that defines Excess Net Income is in Section 1.09[a]. This section makes no reference whatsoever to Schedule E. Rather, as plaintiff testified, Schedule E was supposed to serve as an illustration for how to calculate withdrawal payments if two members withdraw at the same time (*see* J-18 at DEF0000674).

It became clear at trial that plaintiff alone drafted Schedule E. It also became clear at trial that plaintiff was the main person to interface with the lawyers in drafting the Operating Agreement. Yet, neither the lawyers plaintiff dealt with, nor defendants, understood or cared about Schedule E. In fact, the defendants derided plaintiff's efforts, referring to the spreadsheet as a "Frankenstein mess." Schedule E was difficult for the court to follow as well.

The evidence at trial revealed that defendants, and perhaps the lawyers, were merely humoring plaintiff who made endless calculations and recalculations to Schedule E. Plaintiff wore everyone down with the minutiae of Schedule E and his constant changes, that at some point everyone (lawyers and defendants) stopped paying attention to him and the Schedule. After all, there was no reason for Schedule E. It was for illustration purposes only (*see* J-18 at DEF0000675 [noting "SCHEDULE E TO ADDENDUM B – ILLUSTRATION"]). Meanwhile, the definition of "Excess Net Income" never changed from draft to draft. One would think if plaintiff meant

[* 2]

something different from what the actual definition the drafts contained, surely he would have mentioned it. Thus, there is no ambiguity. The definition as to how to calculate "Excess Net Income" never changed.

Plaintiff contends that deducting customary operating expenses and the income hurdle rate amounts to deducting expenses twice "once for the agreed to IHR, and then again as customary operating expenses" (*see* Doc 200 [Plaintiff's Brief] at 5, citing tr at 28, 145). Plaintiff also points out that "if the [customary operating expenses] is also deducted from Total Revenue, the remaining Members could run up arbitrary expenses and claim there was no money left to pay the former Member" (*id.*, citing tr at 27-28).

However, Dan Barker and Eric Almeraz testified credibly that "customary operating expenses" and the Income Hurdle Rate are distinct concepts, and that they intended to deduct both when calculating Withdrawal Payments: The "aggregate customary operating expenses related to such Current Fees" are Apis's and DEKI's actual operating expenses during the year in which they received the Current Fees (P-24; tr at 274). Meanwhile, the "Income Hurdle Rate" is the minimum income allowable before a partner who has withdrawn can share in any profits. The purpose of the Income Hurdle Rate is to compensate the remaining working Members and to provide funds to be reinvested in the business (tr at 274:7-12, 308:19-309:3, 318:13-20; *see also* P-24 ¶ 9; D-26; *see also* J-18, Addendum B § 1.07 [the Company "may withhold from any distributions otherwise payable to a Withdrawn Member...amounts to provide for estimated accrued expenses, liabilities or contingencies"]). This is distinct from Operating Expenses.

At best for plaintiff, there was no meeting of the minds as to what was supposed to be used to calculate Excess Net Income. Without a meeting of the minds, plaintiff cannot enforce his version of the agreement (*D'Artagnan, LLC v Sprinklr Inc.*, 192 AD3d 475, 476-77 [1st Dept

[* 3]

2021], citing *Gessin Elec. Contractors, Inc. v 95 Wall Assoc.*, LLC, 74 AD3d 516, 518 [1st Dept 2010]).

In any event, the court need not go down the "meeting of the minds" road because Section 1.09 is quite clear that both customary operating expenses and the income hurdle rate are to be deducted when calculating Excess Net Income. Again, that definition is as follows:

> (a) "Excess Net Income" for a Fiscal Year means the aggregate Current Fees received by Apis and DEKI for such Fiscal Year, less the aggregate customary operating expenses related to such Current Fees, *minus* the Income Hurdle Rate for such Fiscal Year set forth on Schedule B hereto, which rate may be updated from time to time by a Majority in Interest of the Managing Members in their sole discretion.

(J-18 at DEF0000667)

Moreover, even if section 1.09 were unclear, having been the sole drafter of Schedule E, any ambiguity is construed against plaintiff under the doctrine of *contra proferentum* (*327 Realty, LLC v Nextel of New York, Inc.*, 150 AD3d 581, 582 [1st Dept 2017] ["To the extent there may be an ambiguity, it is properly construed against the drafter"]). In addition, for similar reasons, plaintiff has not met his burden of proof.

Plaintiff contends, without authority, that the doctrine of *contra proferentum* "is not intended for this situation where one partner drafts a provision approved by other partners and then there turns out to be some type of ambiguity" (Doc 200 [Plaintiff's Brief] at 18). To the contrary, the doctrine is precisely meant for this type of situation (*Schron v Troutman Saunders LLP*, 97 AD3d 87, 93 [1st Dept 2012], *affd sub nom. Schron v Troutman Sanders LLP*, 20 NY3d 430 [2013]; *see also 151 W. Assoc. v Printsiples Fabric Corp.*, 61 NY2d 732, 734 [1984] ["It has long been the rule that ambiguities in a contractual instrument will be resolved *contra proferentem*, against the party who prepared or presented it."]). The doctrine is not merely for "contracts of adhesion." The rule applies as a last resort where extrinsic evidence does not resolve a controversy

[* 4]

(*see e.g. Fernandez v Price*, 63 AD3d 672, 676 [2d Dept 2009]; *see also Albany Sav. Bank, FSB v Halpin*, 117 F3d 669, 674 [2d Cir 1997] ["...New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without a satisfactory result'"]). At best for plaintiff, the evidence is at an impasse. Therefore, having drafted Schedule E alone, and having the burden of proof, plaintiff loses.

Nevertheless, even without a failure of a meeting of the minds, or *contra proferentum* or plaintiff's failure to carry his burden of proof, plaintiff's construction makes no sense. Under plaintiff's interpretation, he would receive a greater share of the profits as a withdrawn member than he would have received had he stayed at the company. If the Agreement required paying withdrawing members more than they would have received if they stayed at the Company, then all partners would be incentivized to leave and the company would collapse. This is a commercially unreasonable interpretation that the court rejects (*In re Lipper Holdings, LLC*, 1 AD3d 170, 171 [1st Dept 2003] ["A contract should not be interpreted to produce a result that is absurd"]; *see also Cole v Macklowe*, 99 AD3d 595, 596 [1st Dept 2012]).

The reason the parties entered into the Third Operating Agreement was because the formula for paying a withdrawing member from the Second Amended and Restated Operating Agreement (the "Prior Agreement") was so flawed that it did not protect defendant Apis from a substantial drop in revenue while still having to pay the full amount to a former member. The parties learned this the hard way when Mr. Werber, a former partner, withdrew, but continued to receive millions even though Apis experienced a drop in revenue. Given this impetus for amending, it makes little sense the parties would have adopted a calculation to pay a withdrawing partner that actually worsened the problem from the Prior Agreement.

**Page 5 of 6**

[* 5]

Even plaintiff acknowledged that "no consideration was made to the health of the firm" and the Company was "unprofitable and paying [Werber] large payouts" after his withdrawal under the Prior Agreement, and asked Wilson Sonsini to amend the Prior Agreement to resolve this issue (*see* J-4).

Plaintiff admits: "The IHR was established by the Members for two reasons. First, to protect against company expenses being manipulated to the detriment of a withdrawn Member. Second, to provide a financial cushion so that the situation which existed when Werber left Apis would not arise again and expose the company to being compelled to pay a former Member even if Apis/Deki was not making any money in a particular year" (Doc 200 [Plaintiff's Brief] at 5).

Thus, plaintiff's interpretation (1) relies on a "Schedule" that was for illustrative purposes only; (2) that he alone drafted, (3) that is at odds with the plain language of the agreement; and (4) makes no business sense.

Accordingly, the court renders judgment for defendant(s).

DATE 7/8/2024

| CHECK ONE: | x | CASE DISPOSED | | | NON-FINAL DISPOSITION | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | GRANTED | | DENIED | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

[* 6]