OPINION OF THE COURT
Saxe, J.P.
This dispute arises out of an arrangement by which defendant US Airways, while it was the owner or operator of the three aircraft at issue here, had acquired from the manufacturer the right to operate the aircraft at a maximum takeoff weight (MTOW) in excess of the MTOW assigned to them upon manufacture.
US Airways’ predecessor company, America West Airlines, Inc., acquired the three 737-3G7 aircraft from Boeing in 1991. At that time, each aircraft had an MTOW of 124,000 pounds. Pursuant to a program offered by Boeing called the Flex Program, US Airways entered into an agreement with Boeing that permitted it to operate the three aircraft at an increased MTOW of 138,500 pounds. However, US Airways’ right to do so was subject to annual reports and payments of fees to Boeing, and, according to US Airways, the right to operate the three aircraft at the increased MTOW under the Flex Program agreement was not transferable.
In 2005, plaintiff Wells Fargo Bank Northwest, N.A., as Trustee, purchased the three aircraft from US Airways, then leased them all back to US Airways for a three-year term. Each purchase agreement included a page entitled “aircraft technical data,” which specified that the MTOW of its subject aircraft was 138,500 pounds, with a footnote stating, “Current as of 2 September 2005.” Nothing in the purchase agreements mentioned US Airways’ arrangement with Boeing by which the aircraft’s MTOW had been increased from 124,000 to 138,500 pounds.
The lease agreements provided, in section 19, for “Redelivery Conditions.” Upon US Airways’ turnover of the aircraft to Wells *4 Fargo at the end of the lease term, Wells Fargo was permitted a final inspection, including a detailed “operations ground check,” an “acceptance flight” demonstrating the airworthiness of the aircraft, and a full aircraft documentation review, to verify that the condition of the aircraft complied with the agreements. Section 19 provided further that, after the inspection, Wells Fargo would provide US Airways with a “Redelivery Certificate” acknowledging and confirming that US Airways had redelivered the aircraft to Wells Fargo in accordance with the agreement.
Schedule 11 to the lease agreements, entitled “Return Conditions,” listed the terms pursuant to which each aircraft was to be redelivered to Wells Fargo. Notably, section 1 (q), under “General Condition,” provided that the “[operating weights of the Aircraft will be as at delivery and will be freely transferable” (emphasis added). The term “Delivery” was defined as “delivery of the Aircraft on lease by Lessor to Lessee hereunder as evidenced by Lessee’s execution and delivery of the Lease Supplement.”
At the end of the lease terms, in accordance with the foregoing, Wells Fargo had a team of experts conduct the final inspections. These experts identified a number of discrepancies, all of which were resolved before the redelivery of the aircraft. However, the MTOW of the aircraft was not the subject of any inspection or discussion. Wells Fargo accepted redelivery of the aircraft, and the parties executed Redelivery Certificates as provided for in the lease agreements.
The Redelivery Certificates provided at paragraph 3:
“By signing this Certificate, [Wells Fargo] accepts redelivery of the Aircraft under the Lease Agreement without prejudice to each party’s rights and obligations under the Lease Agreement. All risks in the Aircraft shall pass from [US Airways] to [Wells Fargo] upon the effectiveness of this Certificate.”
Paragraph 4 of the Redelivery Certificates provided:
“Except as listed on Appendix 2 hereof, [US Airways] has returned the Aircraft to [Wells Fargo] in the condition set forth in Schedule 11 of the Lease Agreement (each deviation from such requirement in the Lease Agreement, a ‘Discrepancy’). Set forth across from each Discrepancy listed on Appendix 2 is the action that the parties have agreed will be taken with respect to such Discrepancy.”
*5 Paragraph 6 provided:
“(a) The Aircraft. . . [is] hereby redelivered by [US Airways] and accepted by [Wells Fargo] in accordance with the Lease Agreement subject to (i) any provision of the Lease Agreement that by its own terms survives the termination of the Lease Agreement, (ii) any payments or actions to be taken pursuant to any Discrepancy set forth on Appendix 2 hereof, and (iii) any rent and redelivery compensation as set forth on Appendix 4 hereof.”
Finally, paragraph 6 (d) provided that “[t]he Lease Agreement is hereby terminated subject only to the provisions of paragraph 6 (a) hereof.”
It is not disputed that, at the time the aircraft were redelivered by US Airways and accepted by Wells Fargo, the MTOW of the aircraft was back down to 124,500 pounds, because the increased MTOW obtained by virtue of US Airways’ Flex Program arrangement with Boeing was not transferred. It is also undisputed that Wells Fargo, unaware that the MTOW listed in the 2005 purchase agreements had previously been increased from the MTOW at the time of manufacture pursuant to the Flex Program, did not list aircraft MTOW as a discrepancy in appendix 2 of the Redelivery Certificates.
Months after the redelivery of the aircraft and termination of the lease, Wells Fargo learned for the first time of the 124,500-pound MTOW and the arrangement US Airways had had with Boeing for the increased MTOW. US Airways refused Wells Fargo’s requests to “resolve” the issue. Needing to proceed with its new leases, Wells Fargo paid Boeing $544,400 so that its new lessees could operate the aircraft at the increased 138,500-pound MTOW. Wells Fargo then brought this action, seeking, essentially, rescission of the Redelivery Certificates and damages for breach of the leases; its fraudulent inducement and negligent misrepresentation claims were withdrawn and dismissed, respectively.
Wells Fargo moved for partial summary judgment on its breach of contract claim, based on the argument that as a matter of law US Airways had violated the lease agreements’ requirement that at their redelivery “[ojperating weights of the Aircraft will be as at delivery and will be freely transferable,” since the aircraft had an MTOW of 138,500 pounds at the time of “delivery” as that term was defined by the leases.
In opposing summary judgment, US Airways contended that the term “delivery” as used in the leases was susceptible to two *6 distinct meanings: when the term was capitalized, it referred to delivery of the aircraft by Wells Fargo to US Airways, but when not capitalized, it referred to the delivery from Boeing to US Airways. Thus, when the lease agreements stated that the aircraft were to be redelivered to Wells Fargo with an MTOW “as at delivery,” since a lower case “d” was used, they referred to an MTOW of 124,500 pounds. US Airways argued further that Wells Fargo had waived any right to claim noncompliance with the lease agreements when it executed the Redelivery Certificates.
The motion court granted Wells Fargo’s motion for partial summary judgment, rejecting the argument that the term “delivery” in the lease always referred to the date on which the leases began, and therefore finding US Airways liable for breach of contract (Wells Fargo Bank Northwest, N.A. v US Airways, Inc., 30 Misc 3d 1241[A], 2011 NY Slip Op 50428[U] [2011]). Because the reference to the delivery of the aircraft related only to the date on which the leases began, at which time the MTOW of the planes was 138,500 pounds, the court reasoned that US Airways had, and breached, a contractual obligation to return the aircraft with MTOW of 138,500 pounds.
The court also rejected US Airways’ argument that Wells Fargo’s execution of the Redelivery Certificates constituted a waiver, on the ground that the agreements’ provisions regarding the Redelivery Certificates state that the certificates do not prejudice the parties’ rights under the agreements.
We now reverse.
Initially, we agree with the motion court that the leases required US Airways to turn over the aircraft with the MTOW of 138,500 pounds that the aircraft had at the time the leases commenced. We reject US Airways’ argument that the leases’ use of the word “delivery” was ambiguous, or could be interpreted to mean the date that the manufacturer first delivered the aircraft. The lease agreements’ use of the term “delivery” is not ambiguous (see Kolmar Ams., Inc. v Bioversel Inc., 89 AD3d 493 [2011]). Every use of the term “delivery,” whether or not the “d” is capitalized, refers to the delivery of the aircraft from Wells Fargo to US Airways, except where the use of the word is specifically qualified to clarify its reference to a specific type of “delivery,” for example “for first Aircraft delivery” and “at new delivery” (emphasis added).
In any event, it is simply unreasonable to suggest that a lease agreement between Wells Fargo and US Airways, having *7 absolutely nothing to do with Boeing, would use the term “delivery” to refer to a transaction between Boeing and US Airways’ predecessor that occurred 14 years before Wells Fargo ever purchased the aircraft (see RM Realty Holdings Corp. v Moore, 64 AD3d 434, 436 [2009]). Since it is undisputed that the aircraft were “redelivered” to Wells Fargo at the end of the lease term with an MTOW different from the MTOW at the time of their “delivery,” Wells Fargo has established a failure to comply with section 1 (q) of the Return Conditions listed in schedule 11 to the lease agreements.
However, we find that Wells Fargo’s execution of the Redelivery Certificates without reference to the MTOW discrepancy precludes it from raising or seeking relief for that breach.
By executing the Redelivery Certificates, Wells Fargo certified that US Airways had fully performed its obligations under the lease, and that the aircraft had been returned in compliance with the parties’ agreements. Importantly, paragraph 6 (d) of the certificates provided that upon execution of the certificates, the lease agreements were “terminated subject only to the provisions of paragraph 6 (a) hereof.” Paragraph 6 (a) made the redelivery and acceptance
“subject to (i) any provision of the Lease Agreement that by its own terms survives the termination of the Lease Agreement, (ii) any payments or actions to be taken pursuant to any Discrepancy set forth on Appendix 2 hereof, and (iii) any rent and redelivery compensation as set forth on Appendix 4 hereof.”
Except for those delineated circumstances, Wells Fargo’s right to seek enforcement of the terms of the leases ceased upon its certification that the aircraft had been returned in compliance with the leases, at which time the leases were terminated.
The lease provision requiring that at redelivery, “[ojperating weights of the Aircraft will be as at delivery,” does not fall into any category delineated in the above-quoted paragraph 6 (a) of the Redelivery Certificates. It does not by its terms survive the termination of the leases, unlike, for example, section 23.15 of the leases, the indemnity provision, which provides that all indemnities and other obligations of the lessee “shall survive, and remain in full force and effect, notwithstanding the expiration or other termination of this Agreement.” There is nothing about section 1 (q) of the Return Conditions listed in schedule 11 to the lease agreements that differentiates it from all the *8 other return conditions listed in schedule 11, which, under paragraph 4 of the Redelivery Certificates, are explicitly considered satisfied if not listed as discrepancies.
Nothing in lease section 19 allows for a belated claim of a violation of the leases’ Return Conditions after execution of the Redelivery Certificates. Section 19.1 (b) requires that upon their return, “the Aircraft shall be in compliance with the Return Conditions and the other requirements of the Lease,” and sections 19.2 and 19.3 provide for complete review by Wells Fargo of the aircraft and their documentation, giving it the opportunity to discover any discrepancies. Even section 19.9, entitled “Rectification and Delay,” which recognizes the possibility that the aircraft might be returned in a condition other than that required by the lease, merely focuses on the possibility that the lessee might dispute a discrepancy claimed by the lessor, prompting further procedures that would delay the return of the aircraft.
The “without prejudice” language of paragraph 3 of the Redelivery Certificates does not allow Wells Fargo to assert a breach of the lease’s Return Conditions after the execution of the Redelivery Certificates and termination of the lease. Paragraph 3 states, “By signing this Certificate, Lessor accepts redelivery of the Aircraft under the Lease Agreement without prejudice to each party’s rights and obligations under the Lease Agreement.” However, this provision cannot properly be understood to permit Wells Fargo to sue for a belatedly realized breach of the lease’s Return Conditions after the lease has been terminated. Rather, when read in the context of both the lease agreements and the entirety of the Redelivery Certificates, paragraph 3 merely preserves rights granted by the leases that do not conflict with the terms of the Redelivery Certificates, such as clauses that survive termination of the leases. Interpreting paragraph 3 as broadly as Wells Fargo suggests would render meaningless the certification that the aircraft had been delivered “in the condition set forth in Schedule 11 of the Lease Agreement” except for noted discrepancies.
In Jet Acceptance Corp. v Quest Mexicana S.A. de C.V. (87 AD3d 850 [2011]), this Court considered circumstances in which the defendant entered into four agreements to lease four airplanes from the plaintiff. These agreements provided for a procedure by which the lessor would present the planes to the lessee for inspection, the lessee would verify that the planes conformed to the lease specifications, and, after so doing, would *9 execute an “Acceptance Certificate” confirming that the aircraft met all the lease requirements unless a notation of a reservation was made on the appropriate form. The lessee performed the inspection of the first airplane, then executed the Acceptance Certificate. However, a dispute about the type of insurance the lessee had obtained to cover the first airplane led the lessee to refuse to cooperate with the pre-lease inspections of the other three planes. The lessor sued for breach of the four contracts.
In affirming the award of summary judgment to the plaintiff in Jet Acceptance Corp., this Court observed that “[ojnce Quest executed the acceptance certificate, it effectively waived any claim that the airplane was not in condition for delivery” (id. at 855). In rejecting Quest’s assertion, in response to the summary judgment motion, that its aviation expert determined that the second and third aircraft were not in flying condition, we observed that
“[t]he leases established a method for Quest to object to the condition of the aircraft, at the time they were presented, before accepting delivery. Quest chose not to assert its rights under those provisions. The time for Quest to identify deficiencies in the aircraft was the time that plaintiff presented them to it, not after plaintiff had moved for summary judgment” (id. at 856).
While the present matter may not stand in quite the same posture as Jet Acceptance Corp., the gist of its ruling applies here. The Redelivery Certificates and the lease agreements “established a method for [Wells Fargo] to object to the condition of the aircraft, at the time they were presented, before accepting [re]delivery,” and “[t]he time for [Wells Fargo] to identify deficiencies in the aircraft was the time that [US Airways] presented them to it,” not after it had executed the Redelivery Certificates confirming the aircraft’s compliance (id. at 856). By executing the redelivery certificates, Wells Fargo “expressly confirmed that [US Airways] had fully performed all of its obligations up to that point, including the furnishing of . . . aircraft that materially conformed to the lease” (id. at 855).
It is not important that Wells Fargo did not explicitly state that it was waiving its right to enforce the contract after its termination. It had no such continuing posttermination right with regard to any provision that did not explicitly survive. Nor *10 is it important that the discrepancy was a matter that could only be discerned from documents rather than a tangible physical deviation apparent upon physical inspection; Wells Fargo’s inspection was to cover both the craft and the documents. As in Jet Acceptance Corp., by executing the Redelivery Certificates, Wells Fargo “effectively waived” any claim that the aircraft were not in compliance with the Return Conditions of the lease (87 AD3d at 855).
Wells Fargo’s argument that it accepted redelivery in reliance on US Airways’ representations in the Redelivery Certificates is specious at best. Any such purported reliance would have been unreasonable as a matter of law. If Wells Fargo had been entitled to accept redelivery in reliance on US Airways’s assertions that the aircraft were compliant, then there would have been no need for the elaborate procedure by which its experts would inspect the aircraft and documentation, followed by its execution of the Redelivery Certificates. The listing of discrepancies was Wells Fargo’s obligation, not US Airways’; the leases expressly provided that the purpose of the final inspection was to allow Wells Fargo to ensure, for itself, that the condition of the aircraft complied with the leases.
Finally, summary judgment should be awarded to US Airways, because Wells Fargo’s execution of the Redelivery Certificates effectively precludes it from belatedly claiming a breach of the terminated leases based on noncompliance with the Return Conditions of the leases.
Accordingly, the order of the Supreme Court, New York County (Bernard J. Fried, J.), entered March 23, 2011, which granted plaintiffs motion for partial summary judgment as to liability on its breach of contract cause of action, should be reversed, on the law, and, upon a search of the record, summary judgment granted to defendant dismissing the complaint. The Clerk is directed to enter judgment accordingly.
Sweeny, Catterson, Renwick and Manzanet-Daniels, JJ., concur.
Order, Supreme Court, New York County, entered March 23, 2011, reversed, on the law, without costs, and, upon a search of the record, summary judgment granted dismissing the complaint. The Clerk is directed to enter judgment accordingly.