**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY and Massmutual Corporate Investors, Plaintiffs**

v.

**ARITECH CORP., Defendant.**

**Civ. A. No. 94–30097–MAP.**

United States District Court, D. Massachusetts.

April 13, 1995.

Andrew C. Griesinger and Douglas S. Brown, Choate, Hall & Stewart, Boston, MA for plaintiffs.

John H. Henn and David Kahan, Foley, Hoag & Eliot, Boston, MA, for defendant.

## MEMORANDUM REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiffs, Massachusetts Mutual Life Insurance Company and MassMutual Corporate Investors (hereinafter "MassMutual") loaned the defendant, Aritech Corporation, $10 million dollars under an arrangement referred to in the insurance industry as a private placement investment transaction. The sole issue in this case is whether the terms of two identical loan agreements required Aritech to pay plaintiffs a premium when it retired this debt ahead of schedule.

The parties' cross-motions for summary judgment focus on this narrow question. Because the plain language of the loan agreements required Aritech to pay MassMutual a prepayment premium, plaintiffs' Motion for Summary Judgment will be allowed and defendant's denied. The factual background and the court's reasoning are set forth below.

### II. SUMMARY JUDGMENT STANDARD

The parties agree that this diversity action is governed by the substantive law of Massachusetts. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); American Title Ins. Co. v. East West Fin. Corp., 959 F.2d 345, 348 (1st Cir.1992). While some disputed issues of fact hover in the background of these motions, resolution of the

dispute rests solely on an interpretation of unambiguous contract language. Under these circumstances, the disputed issues are immaterial and the cross-motions may be resolved as a pure question of law. *See Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d 990, 994 (1st Cir.1992), citing *Freelander v. G. & K. Realty Corp.,* 357 Mass. 512, 516, 258 N.E.2d 786 (1970).

## III. FACTUAL BACKGROUND

### A. Private Placement Investments

A private placement investment is a type of commercial financing agreement offered by the insurance industry. In such a transaction the borrower issues private securities or notes to the lender in exchange for a long-term fixed rate loan. The insurance company gets the benefit of a reliable income stream to meet fixed obligations to its customers. The commercial borrower is able to secure a loan without making a public offering and subjecting its finances to public scrutiny.

Since the carrot for the lender in this kind of arrangement is the fixed long-term return on its loan, private placement agreements often contain provisions that require the borrower to pay a premium for an early retirement of the debt. Prepayment provisions permit the borrower to refinance its debt if interest rates fall and it can obtain money more cheaply elsewhere. At the same time, a premium or "make whole" provision assures the lender that it will not lose the income it relied on receiving.

Under certain circumstances, some private placement investments permit the lender to elect to take an equity interest in the borrower's business by converting the notes to stock in the company at a predetermined price. Private placement transactions which permit the conversion of notes to stock are said to contain an "equity kicker" provision.

With an equity kicker, if the borrower's business prospers, the insurance company may convert its fixed-rate investment to a stock investment and then sell the stock for a profit. The lender's option to convert is triggered by a specific stock price, called the conversion price, set when the parties negotiate their agreement. This price is usually higher than the price the stock is trading at when the investment is made. The advantage to the borrower of equity kicker agreements is a lower rate of interest than would otherwise be charged.

To add a further wrinkle, private placement investment transactions with equity kicker provisions usually contain a "forced conversion" feature that permits the borrower to prepay on the notes if its stock has traded for a set period of time at a level significantly higher than the optional conversion price. This provision permits the borrower to "force" the lender to fish or cut bait: that is, either convert its notes to stock or allow the borrower to prepay. If the lender decides not to convert its notes to stock, the borrower can then extinguish the lender's conversion option by prepaying its obligation with a premium. Forced conversion prevents the lender from reaping a windfall by patiently collecting interest on its notes as the stock price rises and then converting the notes to stock just prior to the loan's maturity. If there is no conversion, and the borrower prepays, the prepayment premium protects the insurance company and provides compensation for its lost income stream.

### B. Business Context

In March, 1988, Aritech, a developer and manufacturer of electronic security systems, was seeking a private placement investment to retire a large debt associated with its corporate restructuring. In August of that year, MassMutual[1] and Aritech closed a private placement transaction (the 1988 Note Agreements). MassMutual advanced $10 million to Aritech in exchange for $10 million in convertible subordinated notes due in ten years.

In 1989 and 1990 Aritech experienced serious financial difficulties, defaulting on its obligations to senior bank lenders and violating

---

[1]. As noted in the introduction, Massachusetts Mutual Life Insurance Company and MassMutual Corporate Investors each signed identical loan agreements with Aritech. For purposes of this discussion the Note Agreements are treated as a single entity.

numerous covenants in the 1988 Note Agreements. Under the provisions of these agreements, Aritech's default permitted MassMutual to demand immediate repayment of the $10 million.[2] In order to resolve its indebtedness and continue operations, Aritech sold its European operations and proposed to MassMutual that it accept a $5 million payment on its loan and a restructuring of the remaining debt. MassMutual accepted this proposal and on June 28, 1991, the parties amended the Note Agreements to reflect both the prepayment and the amended terms of the parties' remaining loan arrangement.

These amendments contained an express waiver of the prepayment premium due MassMutual as set forth in § 9.2 of the 1988 Note Agreements. No premium was paid, therefore, for the $5 million prepayment. Apparently, this waiver reflected MassMutual's desire to recover a good portion of its initial investment before further misfortune struck Aritech. The amendments also included a 50% reduction in the conversion price of Aritech's stock, reflecting the dramatic fall in its stock price.

In early 1992, Aritech and MassMutual held further discussions regarding the restructuring of Aritech's remaining $5 million obligation. Based on a marked improvement of Aritech's financial performance, MassMutual agreed to refinance the remaining $5 million principal balance, issuing two notes, one for $1.5 million and the second for $3.5 million. The notes did not mature until the year 2000 and required Aritech to pay off the loan at a rate of $1,000,000 per year starting in March, 1996.

In March of 1992, this deal was codified in further amendments to the Note Agreements (1992 Amendments). Section 9.2, entitled "Option Prepayment with Premium," was modified to permit prepayment with a premium if Aritech stock was trading at 140% of the conversion price for twenty consecutive days. Thus, Aritech could "force" MassMutual to exercise the equity kicker and either convert its loan to stock, or allow Aritech to prepay with a premium once the stock went to 140% of the conversion price. The 1992 Amendments also provided for an increase of the interest rate from 8.75% to 10% and a "make whole" premium to accompany early retirement of the debt.

Section 9.2 of the 1992 Amendments reads in its entirety as follows:

> *Option Prepayment with Premium.* At any time or from time to time, [Aritech] may, at its option, upon notice as provided in section 9.4 prepay all or any part (an integral multiple of $10,000 and a minimum of $50,000 of such lesser amount as shall be then outstanding) of the principal amount of the Notes upon the concurrent payment of premium equal to the Make Whole Amount if there shall have been a period of at least 20 consecutive trading days during which the last reported sale price for the shares of Common Stock in the principal market for such shares (said principal market to be determined in good faith by the Board of Directors of [Aritech]) was at least 140% of the Conversion Price in effect on each of such days.

In October 1993, Berwind Industries and Aritech completed a merger and acquisition agreement that effectively placed Aritech under the control of a Berwind subsidiary, Sentrol Lifesafety Corporation. Prior to the completion of the merger, a Berwind executive contacted MassMutual to inform it that the Aritech debt would be retired as soon as the merger was completed.

Aritech received MassMutual's permission to prepay the debt even though Aritech's stock had not traded at 140% of the conversion price for twenty days as required by § 9.2. However, a dispute arose as to whether, in these circumstances, § 9.2 required Aritech to pay a make whole prepayment premium. Aritech argued that it did not pay such a premium when it prepaid the first $5 million of debt in 1991, and that it did not have to pay a premium at this time either. MassMutual took the position that § 9.2 of the 1992 Amendments expressly re-

---

**2.** The 1988 Note Agreements contained a provision, § 9.2, permitting prepayment of the debt with a prepayment premium. The agreement also contained an equity kicker and a forced conversion clause. The particular language of those agreements is not at issue in this dispute. *See* Affidavit of Richard Morrison, Ex. 2. at 16–17.

quired a make whole premium with the prepayment.

Ultimately, Aritech paid MassMutual the remaining $5 million in debt plus interest, but refused to pay the make whole premium due, approximately $900,000. MassMutual ultimately filed this suit to recover the make whole amount plus interest due, claiming a breach of the Note Agreement.

## IV. *DISCUSSION*

■ Aritech and MassMutual have filed cross-motions for summary judgment to resolve the sole issue in this case: does § 9.2 of the 1992 Note Amendments require Aritech to pay a make whole premium with the prepayment of its obligations to MassMutual? Each party argues that both the plain language of the prepayment provision and the parties' course of dealing support their respective positions.

■ Massachusetts law is clear that there is no need to reach the business context surrounding an agreement if the contract is by its terms unambiguous. *Fairfield 274-278 Clarendon Trust v. Dwek*, 970 F.2d 990, 993 (1st Cir.1992) (citing *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516, 258 N.E.2d 786 (1970)). Absent fraud or mistake (neither of which are alleged here), an agreement is presumed to express the intent of the parties. *Id.* (citing *Hess Oil & Chemical Corp. v. Ristuccia*, 3 Mass.App. 772, 331 N.E.2d 823 (1975)). Nor can evidence of prior or contemporaneous oral agreements be considered to *vary or modify* the terms of an unambiguous written contract. *Id.*, citing *New England Financial Resources, Inc. v. Coulouras*, 30 Mass.App. 140, 566 N.E.2d 1136 (1991).

Aritech contends that § 9.2, the prepayment provision, has three distinct parts: a right to prepay clause, the prepayment (or make whole) premium clause, and a stock price (or forced conversion) clause. Defendant argues that the stock price clause determined when and if a prepayment premium was due, i.e. if the stock traded at 140% of conversion price for twenty consecutive days. In other words, Aritech contends that the stock price clause modifies *only* the prepay-

ment premium clause and has nothing to do with the right to prepay clause. Aritech contends that, because the stock was *not* trading at or above the level quoted in the stock price clause of § 9.2, no premium was due.

MassMutual argues that Aritech's interpretation of § 9.2 irrationally severs the prepayment premium clause from the clause establishing the right to prepay. MassMutual maintains that the forced conversion clause refers to and affects the entire preceding portion of § 9.2. Plaintiffs cite the fact that there are no commas, a semicolon or any other grammatical signal separating the clauses of this provision in a manner suggested by defendant's construction. A premium is due, according to MassMutual, whenever there is a prepayment.

The parties' positions present a grammatical conundrum that would delight the heart of a high school English teacher. Boiled down, Aritech's position depends entirely on the following construction of § 9.2: Aritech may prepay, with a prepayment premium if its stock reaches a certain price. The prepayment premium must *only* be paid, in other words, if the stock reaches a certain level.

MassMutual takes a different view: Aritech may prepay with a prepayment premium if its stock reaches a certain price. In other words, the right to prepay, always with a premium, is triggered by the stock's attainment of a certain price.

If these differing interpretations evidenced a true ambiguity in the wording of the provision, resort to examination of the parties' course of dealing and oral communications might be required. But there *is* no ambiguity. MassMutual's construction is the only one consistent with grammar and logic; Aritech's falls into the category of imaginative but unsound, for the following reasons.

First, Aritech's construction requires rewriting the provision with, at least, a comma inserted between the section of the provision permitting prepayment and the section requiring a prepayment premium. This would come between the words "Notes" and the word "upon" in the sixth line of the provision as quoted above at 193. With such a comma

it would be clear that the prepayment provision stood on its own, and the premium obligation was dependent on the following clause referring to the stock price.

MassMutual's interpretation depends on no punctuation that is not already in the clause. As it stands, without the comma, the passage referring to the prepayment option is limited and defined by the passage describing the prepayment premium.

The distinction may be analogized to the lessons everyone learned in junior high school about defining and non-defining relative clauses. Thus, the sentence "Lawyers who are charlatans should be flogged" is quite different from the sentence "Lawyers, who are charlatans, should be flogged." In the first sentence the relative clause, not being set off with commas, *defines* a certain class of lawyers; the clause limits its antecedent. In the second sentence, because of the commas, the relative clause is merely descriptive, and all lawyers take a beating. Turning to § 9.2, the passage referring to the prepayment premium limits and defines the passage permitting prepayment. Lacking the comma, the sentence refers only to prepayment *with* a premium—just as in the first sentence above the writer only intends that a certain kind of lawyers, the wicked ones, be beaten.

Second, the overall structure of the Note Agreements supports MassMutual's interpretation of § 9.2. There is nothing in the agreement that buttresses defendant's argument that prepayment was permitted at any time without penalty to the borrower. As the title of § 9.2—"Option Payment with Premium"—makes clear, the purpose of this provision was to give the borrower the option to force the lender to make a choice between obtaining prepayment and enjoying the equity kicker. The stock price level is the triggering event permitting the borrower to make a prepayment.

Third, Aritech's interpretation is irrational. In the context of a private placement investment the prepayment premium and forced conversion feature are logically anchored on the prepayment option. The three clauses only make sense as one interrelated package, which (again) explains the lack of commas.

It makes no sense at all to tie the obligation to pay a prepayment premium to a stock price; it makes eminent sense to tie the right to prepay to a stock price.

 Finally, because MassMutual previously permitted Aritech to retire half of the $10 million debt without paying a prepayment premium, it does not follow that the 1992 Note Agreement permitted Aritech to avoid prepayment. The Note Agreement is not ambiguous. Therefore, under well established principles of contract law, the court may not consider the parole evidence offered by defendant to alter the terms of this clear and well integrated written agreement. *Fairfield 274–278 Clarendon Trust v. Dwek,* 970 F.2d at 994.

## V. CONCLUSION

For the reasons set forth above, defendant's Motion for Summary Judgment is hereby DENIED. Plaintiffs' Motion for Summary Judgment is ALLOWED. The court will set this matter down for a status conference regarding the form of judgment, interest and attorney's fees.