■ JET ACCEPTANCE CORPORATION, Respondent, v QUEST MEXICANA S.A. DE C.V. et al., Appellants. [929 NYS2d 206]—

Plaintiff, an aircraft leasing company, entered into four separate lease agreements with defendant Quest Mexicana S.A. de C.V (Quest), a Mexican entity. Quest intended to use the four aircraft in connection with a well-established tourism business run by its parent company and guarantor, defendant Lomas Group S.A. de C.V. The leases, all identical in their operative terms, established a system for plaintiff to present the planes to Quest for inspection in Canada, where they were stored. The purpose of Quest's inspection was to verify that the planes were in "Delivery Condition," that is, that they materially conformed to the specifications in the leases. Pursuant to the leases, if Quest was satisfied with the condition of each plane, it would be

required to execute an "Acceptance Certificate." The language of the certificate had been negotiated simultaneously with the leases themselves, and a blank copy was annexed to each lease. The form acceptance certificates provided, in pertinent part: "Immediately before Delivery, our technical experts inspected the Aircraft and Aircraft Documents and found that they conformed fully with the Agreement, except as noted in the Delivery Reservations Agreement attached to this certificate (if any). We confirm that the Aircraft meets all of the requirements necessary for us to accept Delivery, and that the Lessor has carried out all of its obligations under the Agreement concerning Delivery. We acknowledge that the Aircraft has been delivered to us 'as is-where is.' "

If Quest determined, upon inspection, that the aircraft were not in delivery condition, then plaintiff would correct the defects (termed "reservations" by the leases) and offer the aircraft again for delivery. This was only necessary if the reservations "prejudice[d the aircraft's] airworthiness or safety," or if the defect "materially affect[ed] the performance, economic operation or maintenance of the [a]ircraft." The leases provided that if Quest determined that a plane had a reservation that did not rise to that level but that the parties agreed was "important," Quest would execute the acceptance certificate, noting the problem as a "Reservation Requiring Action" in the delivery reservations agreement annexed to the certificate. Plaintiff and Quest would then "agree [to] a programme for their correction as soon as reasonably possible after Delivery." Reservations that were agreed to be "minor" could be noted in the delivery reservations agreement as "Reservations Not Requiring Action," and Quest would not be responsible for them before it redelivered the aircraft when the lease expired. If any reservations were noted in the delivery reservations agreement, the leases provided: "Any obligations assumed by the Lessor under the Delivery Reservations Agreement shall be in full and final settlement of all claims or actions which the Lessee may have against the Lessor of any nature in respect of the condition of the Aircraft at Delivery. The Lessor shall not be liable to the Lessee or any other party in respect of any Loss arising out of or connected with any actual or purported difference between the condition of the Aircraft on Delivery and the Delivery Condition."

Finally, each lease contained a "Hell or High Water" provision, which provided: "The Lessee's obligation to pay Rent and to perform all of its other obligations under this Agreement on time is absolute and unconditional in all respects, regardless of

the occurrence of any supervening events or circumstances (whether or not . . . fundamental in the context of the arrangements contemplated by this Agreement). The Lessee must continue to perform all of its obligations under this Agreement in any event and notwithstanding any defence, set-off, counterclaim, recoupment or other right of any kind or any other circumstance, except as otherwise expressly set forth in this Agreement."

Plaintiff presented the first airplane to Quest for inspection in November 2007. Quest inspected the aircraft and performed a test flight. Upon completion of the inspection, it executed the acceptance certificate. The parties executed a delivery reservations agreement that listed a single reservation requiring action. However, the action required by the reservation was to be performed not by plaintiff, but by Quest: "Lessee is yet to furnish Lessor with required Conditions Precedent documentation. Lessor is unable to de-register aircraft until such time as Conditions Precedent are in place. Aircraft has been accepted as being eligible for Export Certificate of Airworthiness. Export Certificate of Airworthiness will be issued subject to Condition Precedent obligations being satisfied."

The condition precedent at issue was Quest's obtaining insurance on the airplane. That requirement was delineated in schedule 6 of each lease, which stated, in pertinent part:

"The Lessee shall keep the Aircraft covered by the following insurance:

"(a) **Hull and Spares All Risks Insurance** (can be in separate policies)

"This insurance shall cover the Aircraft for not less than its Agreed Value on an agreed value basis and shall cover Parts for their replacement cost, against all risks of loss or damage."

Quest was also required to keep the aircraft covered by "Hull and Spares War and Allied Perils Insurance," and schedule 6 explicitly provided that any deductible on the two policies could not contain a deductible greater than $500,000 for hull claims and $10,000 for spares claims.

Quest initially presented proof of insurance that did not include spare parts coverage, and this was deemed satisfactory by plaintiff. However, plaintiff changed course shortly thereafter and demanded that Quest obtain insurance that covered spare parts. Quest failed to provide proof of the insurance, so plaintiff, asserting that Quest had failed to comply with the delivery reservations agreement, did not deregister the aircraft or procure an export certificate of airworthiness, which would

have permitted Quest to fly the airplane from Canada to Mexico. Nevertheless, Quest made the $60,500 rental payment on the first airplane required for November 2007. It also paid the rent in December 2007.

Also in December 2007, plaintiff presented the second airplane to Quest for inspection. Quest, after having the airplane inspected, determined that it was not in delivery condition, thereby triggering plaintiff's obligation to address the deficiencies. Plaintiff attempted to fix the problems, and, in January 2008, re-presented the second aircraft to Quest for inspection. Quest refused to go to Canada to reinspect the second airplane until plaintiff deregistered the first airplane and presented Quest with an export certificate of airworthiness for the first airplane. Further, Quest refused to make the rent payment that became due in January 2008 on the first airplane, and made no further payments.

Plaintiff also presented the third airplane for inspection in January 2008. Again, Quest declined to perform an inspection until the outstanding issues concerning the first aircraft were resolved. Plaintiff declared Quest in default of all three leases. As for the fourth airplane, plaintiff did not present it to Quest for inspection. Rather, it declared Quest in default of the fourth lease pursuant to cross-default provisions contained in all of the leases.

Plaintiff commenced this action for breach of contract, alleging that Quest was in violation of all four leases. After some discovery, plaintiff moved for summary judgment, asserting that it had performed all of its own obligations and that Quest had breached the leases by not paying rent and by not complying with the delivery provisions in the leases. In opposition to the motion, Quest contended that the leases were unconscionable since Quest was a small, commercially unsophisticated company that was new to the world of aviation and did not have equal bargaining power with plaintiff, and since all of the "Events of Default" related to its conduct, and none related to plaintiff's conduct. Additionally, Quest maintained that the leases unfairly permitted the predicament it found itself in to arise, that is, having to pay millions of dollars in rent for airplanes that were not airworthy.

In addition to these legal arguments, Quest submitted an affidavit by Fabian Romero, its former director of maintenance, who stated that he participated in the inspection of the first aircraft. Romero averred that there were material discrepancies between the actual condition of the aircraft and the condition in which the lease required that the aircraft be delivered. However,

he stated, instead of exercising Quest's right to have plaintiff address the problems and to reinspect the aircraft, he executed the acceptance certificate because plaintiff orally represented that it would still rectify all outstanding issues.

Quest also submitted an affidavit by Richard Hatcher, a consultant it retained to assess, for litigation purposes, whether the four aircraft met the delivery conditions required under the leases at the time that plaintiff presented the aircraft for inspection. Hatcher did not inspect the airplanes until March 2009. He claimed, however, that he was able to evaluate the airplanes' histories by studying the detailed records plaintiff was required to maintain. Based on the inspections, Hatcher concluded that the aircraft were not airworthy at the time plaintiff presented them to Quest for inspection. He averred that none of the airplanes could legally have been flown for the purposes intended through at least February 6, 2008.

Quest also submitted an affidavit by Matthew Ellis, an aviation insurance broker. Ellis opined that the leases were ambiguous as to whether Quest was required to furnish spares insurance for the four airplanes because the reference to spares insurance appeared only under headings describing the insurance required, and the descriptions of the required insurance were not consistent with spares insurance.

The motion court granted plaintiff's motion. With respect to the first aircraft, it held that the relevant documents, particularly the acceptance certificate and delivery reservations agreement, unequivocally and unambiguously established that Quest was satisfied with the airplane and was obligated to pay rent on it. The court also rejected Quest's argument that it satisfied the insurance condition, finding that schedule 6 of the leases clearly called for the provision of spares coverage. The court further found that plaintiff properly declared Quest in default for not having adhered to the delivery procedures for the second and third airplanes, and that it was entitled to rely on the cross-default provisions with respect to the fourth airplane. Finally, the court held that the leases were not unconscionable, noting that Quest was represented by sophisticated counsel and stating that Quest failed to establish that the circumstances in which it entered the leases had deprived it of "meaningful choice."

It is axiomatic that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]). Extrinsic evidence may not be introduced to create an ambiguity in an otherwise clear document (*id.* at 163). Here, the acceptance certificate that Quest

signed after its inspection of the first airplane was unequivocal. By executing it, Quest expressly confirmed that plaintiff had fully performed all of its obligations up to that point, including the furnishing of an aircraft that materially conformed to the lease. The affidavit by Fabian Romero, Quest's director of maintenance, which states that he executed the acceptance certificate in reliance on plaintiff's oral representation that it would make further repairs, is exactly the type of extrinsic evidence that may not be used to cast doubt on the import of the otherwise clear acceptance certificate.

Even if we were to consider Quest's assertion that plaintiff made oral representations concerning the condition of the airplane, we would not find that an estoppel arose from those representations. Quest cannot be said to have justifiably relied on an oral representation when that very representation conflicted with the terms of a contract Quest executed (*see Daily News v Rockwell Intl. Corp.*, 256 AD2d 13, 14 [1998], *lv denied* 93 NY2d 803 [1999]; *A-Pix, Inc. v SGE Entertainment Corp.*, 222 AD2d 387, 389-390 [1995]). Similarly, the inspection recounted in the affidavit by Hatcher, Quest's aviation expert, is of no help. Once Quest executed the acceptance certificate, it effectively waived any claim that the airplane was not in condition for delivery.

It is true that the acceptance certificate for the first airplane must be read in conjunction with the delivery reservations agreement. However, the latter document is also clear that plaintiff's obligation to deregister the aircraft and tender the export certificate of airworthiness was contingent on Quest's fulfilling the condition precedent of furnishing proof of insurance. Quest's argument that the lease is ambiguous as to whether spares insurance was required falls short. The language "[t]he Lessee shall keep the Aircraft covered by . . . (a) **Hull and Spares All Risks Insurance**" is anything but ambiguous. The words in boldface are not, as Quest contends, merely a "heading," but rather are operative language expressing the parties' intentions. Moreover, the material that follows the bolded words in no way suggests that the parties did not actually intend to require that Quest provide spares insurance. Indeed, that the parties specifically agreed in schedule 6 to limit the amount of any deductible in a spares policy to $10,000 (as opposed to $500,000 for hull insurance) severely undermines Quest's position that schedule 6 did not impose a requirement on Quest to provide that type of insurance.

Because plaintiff fully performed under the lease, Quest was not justified in failing to pay rent on the first aircraft after

December 2007. Indeed, plaintiff did not even have to rely on the "Hell or High Water" clause. That provision contemplates that Quest has a legitimate "defence, set-off, counterclaim [or] recoupment," none of which Quest has established here. Further, because Quest's decision not to perform under the second and third leases was entirely contingent on its position with respect to the first lease, plaintiff properly declared it in default under those leases, as well as under the fourth lease, based on the cross-default provisions in the leases. We note, again, that the affidavit by Quest's aviation expert, which asserts that none of the aircraft were in flying condition when presented to Quest, is insufficient to defeat summary judgment insofar as the second and third aircraft are concerned. The leases established a method for Quest to object to the condition of the aircraft, at the time they were presented, before accepting delivery. Quest chose not to assert its rights under those provisions. The time for Quest to identify deficiencies in the aircraft was the time that plaintiff presented them to it, not after plaintiff had moved for summary judgment.

Finally, the leases were not unconscionable. Quest's principals, while perhaps new to the world of aircraft leasing, were sophisticated businesspeople, and they were represented by experienced counsel. The leases were negotiated by the parties, not presented to Quest as a take-it-or-leave-it proposition. Even if plaintiff was more experienced than Quest in the business of aircraft leasing, that is insufficient to vitiate the agreement; Quest was sophisticated and sufficiently able to protect its own interests. Indeed, the doctrine of unconscionability rarely applies in a commercial setting, where the parties are presumed to have equal bargaining power (see Gillman v Chase Manhattan Bank, 135 AD2d 488, 491 [1987], affd 73 NY2d 1 [1988]). We find similarly that the leases were not substantively unconscionable. Again, the leases provided Quest with the right to refuse to accept the aircraft until plaintiff established that they were airworthy. Quest finds itself in default not because the agreements were stacked against it, but because it chose not to avail itself of that right. Concur—Mazzarelli, J.P., Sweeny, Acosta, Renwick and DeGrasse, JJ. [**Prior Case History: 28 Misc 3d 1204(A), 2010 NY Slip Op 51150(U).**]