(May 19, 2015)

■ JOSE MARIN et al., Plaintiffs, v CONSTITUTION REALTY, LLC, et al., Defendants. SHERYL MENKES, ESQ., Nonparty Appellant, v DAVID B. GOLOMB, ESQ., et al., Nonparty Respondents. [11 NYS3d 550]—

Order, Supreme Court, New York County (Carol R. Edmead, J.), entered February 21, 2014, which, insofar as appealed from, denied nonparty appellant's motion to fix nonparty respondent David B. Golomb, Esq.'s share of net attorneys' fees at 12% and to determine nonparty respondent Jeffrey A. Manheimer, Esq.'s share of net attorneys' fees on a quantum meruit basis, granted Golomb's motion to fix his share of net attorneys' fees at 40%, and granted Manheimer's motion to fix his share of net attorneys' fees at 20%, affirmed, without costs.

In February 2009, nonparty appellant Sheryl Menkes, as attorney of record for plaintiffs in this personal injury action, entered into an agreement with Jeffrey A. Manheimer under which he would, inter alia, act as cocounsel, provide advice to Menkes, and attend certain depositions and the trial in exchange for 20% of net attorneys' fees. In June 2009, the agreement was amended to specify that Manheimer would act in an advisory capacity only and would not contact the court or others involved in the litigation without Menkes's consent. Neither Manheimer nor Menkes informed plaintiffs of their arrangement or Manheimer's involvement in the case. In August 2009, Menkes wrote to Manheimer discharging him. Menkes stated that from that point forward, she "preferred 'to handle this matter alone.'"

In 2012, plaintiffs were granted summary judgment on liability. In February or March 2013, Menkes sought assistance

from David Golomb to handle "a scheduled May 2013 mediation." In an email to Menkes dated March 12, 2013, Golomb proposed to handle the mediation, including preparation of the case for mediation, for 12% of the attorneys' fees when the case was resolved. He further proposed that "[i]f the case [did] not resolve at the mediation, presently scheduled for May 20, 2013," he would be entitled to 40% of net attorneys' fees. Menkes and Golomb exchanged a series of emails clarifying, among other things, that the total amount of fees Golomb would be entitled to would be 40%, should the case not settle at mediation. The final language regarding compensation was added at Menkes's request. Plaintiffs were notified of this arrangement and consented to it in writing.

Counsel for the parties and representatives of various insurers attended a mediation sponsored by JAMS on May 20, 2013. During this mediation, plaintiffs reduced their demand to $8.5 million and the insurers raised their offer from $2 million to the full extent authorized by excess insurance carriers, which was either $7 million or $7.5 million. The mediation session thereafter ended, although the mediator stated he would attempt to speak with the excess carriers to see if they would negotiate directly with plaintiffs' counsel. It is undisputed that the case was not resolved on that date.

The following day, Menkes and Golomb exchanged emails discussing cash that would be available to plaintiffs under a $7.5 million structured settlement and the effect that a "significant" Workers' Compensation lien would have on the amounts received by plaintiffs.

On May 22, the mediator called Golomb to inform him that he had not heard from the excess carriers and would reach out to them. Golomb told the mediator that the Workers' Compensation lien could not be negotiated downward. That same day, JAMS invoiced Menkes for her portion of five hours of mediation services for the May 20 session.

Menkes emailed Golomb on May 28th and asked whether there was "any news." She proposed to Golomb that perhaps they should take a harder line in negotiations and directly advise the excess carriers that "if we do not settle by a date certain we will not accept settlement and will be prepared to let the jury decide the value of the case." Golomb told Menkes that the mediator advised him that he was going to try and contact the insurers.

Three days later, on May 31, the mediator called Golomb to convey an offer of $8 million, which plaintiffs accepted. The mediator thereafter had no further discussions with any party.

The parties then directly negotiated the terms of the structured settlement, including who would act as plaintiffs' structured settlement broker, plaintiffs' option in choosing an annuity company, etc. The final terms were memorialized in a letter dated June 3, 2013, which was executed on June 5.

Almost immediately thereafter, a dispute arose over the percentage of the fees due to Golomb and Manheimer. Menkes took the position that the mediation did not end on May 20, and, since it continued thereafter and resulted in a settlement, Golomb was only entitled to 12% of the fees. Golomb argued that the mediation ended on May 20, and, since the settlement did not occur as a result of the mediation, he was entitled to 40% of the fees. With respect to Manheimer, Menkes argues that he was entitled to fees based on a quantum meruit basis since he breached the terms of their agreement. Manheimer contends that the agreement clearly states that he is entitled to 20% of the fees since the agreement was terminated without cause by Menkes.

The issue before us is one of simple contract interpretation. Under well established precedent, agreements are to be generally construed in accord with the parties' intent (*see Slatt v Slatt*, 64 NY2d 966 [1985]). The best evidence of the parties' intent is "what they say in their writing" (*Schron v Troutman Sanders LLP*, 20 NY3d 430, 436 [2013], quoting *Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (*W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]; *Jet Acceptance Corp. v Quest Mexicana S.A. de C.V.*, 87 AD3d 850, 854 [1st Dept 2011]). This rule is particularly applicable where the parties are sophisticated and are negotiating at arm's length (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]). Language in a written agreement is deemed to be clear and unambiguous where it is reasonably susceptible of only one meaning or interpretation (*see White v Continental Cas. Co.*, 9 NY3d 264 [2007]; *Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 60 AD3d 61, 67 [1st Dept 2008], *affd* 13 NY3d 398 [2009]). Finally, "[e]xtrinsic evidence may not be introduced to create an ambiguity in an otherwise clear document" (*Jet Acceptance Corp.*, 87 AD3d at 854, citing *W.W.W. Assoc.*, 77 NY2d at 163).

Here, as the dissent agrees, the language of the contract is unambiguous. Menkes argues that she interpreted the term "mediation" to constitute an ongoing process that would not be limited to a single session but rather would continue until an

impasse or other termination had occurred. However, the assertion by a party to a contract that its terms mean something to him or her "where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract" is not sufficient to make a contract ambiguous so as to require a court to divine its meaning (*see Vesta Capital Mgt. LLC v Chatterjee Group*, 78 AD3d 411, 411 [1st Dept 2010]). The specific fee language that Menkes now claims supports her position was added to the agreement at her request. She takes the untenable position that she was never advised that the mediation reached an impasse or had been terminated. Yet despite the fact that the agreement went through several revisions, neither party saw fit to add any language to that effect. Both parties to the agreement are attorneys and thus know the importance of precision in the words used (*see Vermont Teddy Bear Co.*, 1 NY3d at 475). These clear terms, under these circumstances, need no interpretation by the court.

We agree with the dissent that the agreement in question must be read as a whole. When so read, however, the unambiguous language of this agreement does not support Menkes's interpretation that Golomb was required to take steps to prepare the case for trial in order to be entitled to the higher fee. In fact, the language referenced by the dissent states just the opposite. The two pertinent paragraphs of the agreement provide in full:

"I have agreed to review the file, provide whatever services are needed, with your and your office's assistance, to prepare it for the mediation and to handle the mediation. For those services, I will be receive [sic] twelve (12%) percent of all attorneys' fees whenever the case is resolved, whether by settlement, verdict after trial or appeal, calculated after the attorneys have been reimbursed for all expenses laid out. This percentage due shall become fixed and owed upon execution of this agreement.

"If the case does not resolve at the mediation, presently scheduled for May 20, 2013, then I will be responsible, with your and your office's assistance as requested, for preparing for trial and trying the case. After such mediation, I will be entitled to forty (40%) percent of all attorneys' fees whenever the case is resolved, whether by settlement, verdict after trial or appeal, calculated after the attorneys have been reimbursed for all expenses laid out. In the event, this matter has to be tried, the total of all attorneys fees to which I am entitled for all of the services set forth, including mediation, shall be forty (40%) percent of all attorneys' fees whenever the case is resolved,

whether by settlement, verdict after trial or appeal, calculated after the attorneys have been reimbursed for all expenses laid out."

The first paragraph makes reference to "the mediation," not the "process" of mediation. The second paragraph again uses the term "the mediation" and further defines it as "presently scheduled for May 20, 2013." Although the dissent contends the inclusion of the date is merely "descriptive" and "does nothing more than identify when the mediation was to commence," the clear language of the paragraphs does not support that conclusion. Further, there is nothing contained in these paragraphs or the remainder of the agreement that conditions Golomb's entitlement to the higher fee upon his commencing or taking any steps to prepare for trial.

The record clearly reflects that Menkes's current position was part of the *original draft* of the agreement. As noted, she requested a number of revisions that were agreed to by Golomb before both signed the agreement.

In short, Menkes's argument could best be described as constituting "buyer's remorse," asking us to reform a contract that is clear on its face and to insert terms that were not contemplated by the parties because of unforeseen results.

The dissent's adoption of Menkes's argument that mediation is a "process" misses the point. We are not concerned here with mediation in the abstract or what Menkes claims the term meant to her. The unambiguous terms of the contract speak for themselves. The dissent, however, relies on Menkes's expert for the proposition that mediation is an ongoing process and interpreting the contract as we do to limit it to one session would essentially produce an absurd result. To accept Menkes's argument in this regard is to admit extrinsic evidence to an admittedly unambiguous contract which is prohibited by longstanding precedent (*see W.W.W. Assoc.*, 77 NY2d at 163). Moreover, the expert's affirmation does no more than set forth general principles of mediation and his particular practices, and assumes for purposes of his affirmation that the May 20 mediation session was "adjourned," despite the fact that there is nothing in the record indicating such an "adjournment." In effect, his affirmation sets forth the general practice and custom in the industry. Since the contract is unambiguous, this evidence should not be considered (*see e.g. Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]; *OFSI Fund II, LLC v Canadian Imperial Bank of Commerce*, 82 AD3d 537 [1st Dept 2011], *lv denied* 17 NY3d 702 [2011]).

As our dissenting colleague makes reference to the JAMS

website for general propositions applicable to all mediations, we do the same. Under the heading, "The Joint Meeting," the website states: "When all of the procedures have been agreed to and a mediation agreement has been signed, the mediation *session* or sessions are scheduled" (JAMS Arbitration, Mediation, and ADR Services, JAMS Mediation Guide, http://www.jamsadr.com/mediation-guide [emphasis added]). Thus, as in this case, and contrary to the expert's opinion, mediation can, and obviously does on occasion, consist of only one session. It is important to remember that Menkes entered into the agreement with Golomb *after* the mediation session had already been scheduled, hence the phrase "at the mediation, presently scheduled for May 20, 2013." If she anticipated, as she now claims, that the mediation would be an ongoing process, and that a term such as impasse or other specific language formally terminating the mediation was required to activate Golomb's entitlement to 40% of the net attorneys' fees, she had more than ample opportunity to make the appropriate revisions to the agreement before signing it, as she did with several other terms, as noted above. The acceptance of her argument would constitute the addition of a provision to an otherwise unambiguous contract that the parties did not intend to include. More importantly, as discussed herein, Menkes's conduct during settlement negotiations undermines the arguments she now makes in support of her claim that the contract entitles Golomb to only a 12% portion of the attorneys fee.

The parsing of and positioning of the number of commas in this contract, as advanced by Menkes and adopted by the dissent, is simply an attempt to create ambiguity where none exists. As this grammatical argument was raised for the first time in Menkes's reply brief, we decline to consider it (*OFSI Fund II*, 82 AD3d at 538). Were we to consider it, we would find that the plain language of the agreement fails to support it. There is nothing in this agreement or in the record, that indicates that the parties contemplated additional mediation sessions or that the May 20 session was "adjourned," as the expert posits. JAMS billed Menkes for only five hours on May 20, indicating that the mediation had ended. Significantly, despite plaintiff's present contention that the mediation was ongoing, her actions bespeak an acknowledgment that this was not the case. Her email to Golomb of May 28 regarding taking a harder line with the insurers in order to get them to increase their offer indicates her awareness that the mediation had ended and that some action had to be taken by her and Golomb to get the insurers to commence further discussions with a view toward a possible settlement. Thus, her argument that

the contract anticipated additional sessions or a "process" of continuing mediation is belied by the record.

At the end of the day on May 20, the mediation ended because the carriers reached the limits of their authority. There was no commitment by them to seek approval for an increase in their offer or even to discuss settlement further. There was no agreement by the parties to continue negotiations through the mediator, although some may have anticipated that negotiations would continue in some form or other. As of May 28, the excess carriers had not called either the mediator or Golomb to continue negotiations. That the mediator offered to reach out to the excess carriers to see if they would increase their offer does not change the fact that the mediation had ended. At the conclusion of the mediation session on May 20, the parties were not even close to a settlement. They were at least $1 million apart. There were other significant issues such as whether the Workers Compensation lien could be negotiated and in what amount (as noted, Golomb subsequently advised the mediator that the lien could not be negotiated downward); whether any settlement amount could be structured and what surety would do such structuring; whether attorneys' fees could be structured; the net amount to the clients after paying the lien if the offer of $7 million was accepted, as well as several other issues that needed to be resolved before a settlement amount could even be agreed upon.* Notably, the mediator took no action for several days, and the excess carriers did not contact either the mediator or Golomb during that time, and did not increase their offer for 11 days after the mediation session ended. As noted, Menkes herself wanted to take a harder line with the carriers to bring them back to the negotiating table, a distinct change in her position and one that does not indicate that the mediation "process" was ongoing. The claim that the parties anticipated further mediation is simply not supported by this record.

It is a stunning proposition advanced by Menkes and adopted by the dissent that our ruling today creates a situation where an attorney would intentionally violate the Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.7 in order to maximize his or her fee. There is an inherent tension between the interests of attorneys and their clients in settlement negotiations. However, the attorney is bound to resolve such tension in favor of the client by using his or her best judgment in doing what is in the best interests of the client, not his or her

---

* These matters hardly constitute "loose ends" as referenced by the dissent.

own best interests. In any event, such speculation is unwarranted here, since it is undisputed that Golomb did everything he could to settle the case at the mediation session on May 20.

Menkes's invocation of equity in arguing that the motion court's decision was an "absurdly harsh" interpretation of the contract also falls short, since there is no question that Golomb took the lead at the mediation, handled the negotiations during and after the mediation session ended, and even prepared the final settlement documents, which admittedly was beyond Menkes's ability and was outside the scope of Golumb's duties under the agreement. It has long been the rule that an agreement between attorneys regarding division of their legal fees is valid and enforceable and courts will not inquire into the precise worth of their services as long as each contributed, particularly where, as here, there is no claim that each refused to contribute more substantially (*Benjamin v Koeppel,* 85 NY2d 549, 556 [1995]).

With respect to Manheimer, Menkes offers no evidentiary support for her contention that he is only entitled to compensation on a quantum meruit basis because he breached his agreements with her by exceeding his role as set forth in those agreements. She made no claim of such breach at the time she discharged him, and there is nothing in the record to indicate that he did anything in contravention of the agreements. Nor can Menkes void the agreements by citing Manheimer's failure to comply with Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.5 (g), formerly Code of Professional Responsibility DR 2-107 (a) (2) (22 NYCRR 1200.12 [a] [2]), which prohibits the division of legal fees between counsel from different firms except with the client's consent and where the division is proportionate to the work performed by each. Since she violated the rule, she cannot seek to void the agreements by which she agreed to be bound and of which she received the benefit, and plaintiffs were not harmed by the violation (*see Samuel v Druckman & Sinel, LLP,* 12 NY3d 205, 210 [2009]; *Law Offs. of K.C. Okoli, P.C. v Maduegbuna,* 62 AD3d 477 [1st Dept 2009], *lv dismissed* 13 NY3d 771 [2009]). Concur—Sweeny, J.P., Saxe and DeGrasse, JJ.

Andrias and Gische, JJ., concur in part and dissent in part in a memorandum by Andrias, J., as follows: This appeal involves a fee-sharing dispute between nonparty appellant, Sheryl Menkes, Esq., the attorney of record for plaintiffs in this personal injury action, and the successive attorneys she retained to act as cocounsel. The action was settled for $8,000,000.

I agree with the majority that nonparty respondent Jeffrey A. Manheimer, Esq., the first attorney retained by Menkes, is entitled to 20% of the net attorneys' fees under the terms of their agreement, as modified. However, because the action was settled as a direct result of "the mediation" commenced on May 20, 2013, I disagree with the majority's holding that nonparty respondent David B. Golomb, Esq., the second attorney retained by Ms. Menkes, is entitled to a 40% share, rather than a 12% share, of the net attorneys' fees under the terms of their agreement. Therefore, I dissent from that part of the decision.

By letter agreement dated March 12, 2013, at which point plaintiffs had already been granted summary judgment as to liability and a trial had been scheduled on damages, Ms. Menkes retained Mr. Golomb to "assume responsibility for representing plaintiffs in this case." The agreement, drafted on Mr. Golomb's letterhead, provided in relevant part:

"I have agreed to review the file, *provide whatever services are needed, with your and your office's assistance, to prepare it for the mediation and to handle the mediation.* For those services, I . . . will receive twelve (12%) percent of all attorney's fees whenever the case is resolved, whether by settlement, verdict after trial or appeal, calculated after the attorneys have been reimbursed for all expenses laid out. This percentage shall become fixed and owed upon execution of this agreement.

"If the case does not resolve at the mediation, presently scheduled for May 20, 2013, *then I will be responsible, with your and your office's assistance as requested, for preparing for trial and trying the case.* After such mediation, I will be entitled to forty (40%) percent of all attorneys' fees whenever the case is resolved, whether by settlement, verdict after trial or appeal, calculated after the attorneys have been reimbursed for all expenses laid out" (emphasis added).

On May 20, 2013, at 2:00 p.m., a mediation session was held at JAMS before retired Justice Alan Hurkin-Torres. Plaintiffs initially demanded $19,000,000 and defendants offered $2,000,000. By the time the session ended at 7:00 p.m., plaintiffs' demand had been reduced to $8,500,000 and defendants' offer had increased to $7,000,000. However, defendants' offer was not final; they needed to obtain additional authority from their excess insurance carrier for any additional amounts. Consequently, although no adjourned date was set, the mediator, with the parties' consent to his ongoing involvement, continued his negotiations with the carriers and Mr. Golomb, which resulted in an agreement in principle for an $8 million

settlement on May 31, which was memorialized in a letter from Mr. Golumb to defense counsel dated June 3, 2013.

Supreme Court denied Ms. Menkes's motion to fix Mr. Golomb's share of net attorneys' fees at 12% and granted Mr. Golomb's motion to fix his share at 40%. The court found that the phrase, "If the case does not resolve at the mediation, presently scheduled for May 20, 2013," was unambiguous and meant that if the case did not settle at the mediation session held on that specific date, Mr. Golomb would be entitled to a 40% share of net attorneys' fees, even if the settlement was the direct result of the mediation process that began that day. A majority of the panel in this Court agrees.

The court's function in interpreting a contract is to apply "the meaning intended by the parties, as derived from the language of the contract in question" (*Duane Reade, Inc. v Cardtronics, LP*, 54 AD3d 137, 140 [1st Dept 2008]). "[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations" (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 400 [1977] [internal quotation marks omitted]; *see also Gessin Elec. Contrs., Inc. v 95 Wall Assoc., LLC*, 74 AD3d 516, 518 [1st Dept 2010]).

"[A] contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties" (*Cole v Macklowe*, 99 AD3d 595, 596 [1st Dept 2012]). In examining a contract to find the parties' intent as to a particular section, a court should read "the entirety of the agreement in the context of the parties' relationship," rather than isolating discrete provisions out of an entire agreement (*Matter of Riconda*, 90 NY2d 733, 738 [1997]).

In the first paragraph of the letter agreement, Mr. Golomb agreed to "provide whatever services are needed . . . to prepare [the file] for the mediation and to handle the mediation" in return for 12% of the net attorneys' fees. In the second paragraph, the parties agreed that "[i]f the case [did] not resolve at the mediation, presently scheduled for May 20, 2013," Mr. Golomb would be responsible for "preparing for trial and trying the case," and would receive 40% of the net attorneys' fees.

The majority focuses on the phrase "at the mediation, presently scheduled for May 20, 2013," in the second paragraph to conclude that the agreement unambiguously provided that Mr. Golomb would be entitled to a 40% fee unless the case settled at the May 20 session. However, in performing its analysis, the

majority misconstrues the first paragraph, which does not restrict "the mediation" to a single date or session, and expressly obligates Mr. Golomb to "provide whatever services are needed" with respect to the mediation. The majority also gives no weight to the language in the second paragraph regarding Mr. Golomb's obligation to "prepar[e] for trial and try[ ] the case" if it is not resolved at the mediation. By misconstruing this language in the first and second paragraphs, which does not limit the services required of Mr. Golomb in furtherance of "the mediation" and ties his entitlement to the higher fee to post-mediation services, the majority violates the basic rules of construction, which "require [the court] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, [that] no provision of a contract should be left without force and effect" (*Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]; *see also James v Jamie Towers Hous. Co.*, 294 AD2d 268, 269 [1st Dept 2002] [the courts must construe a contract in a manner that avoids inconsistencies and reasonably harmonizes its terms], *affd* 99 NY2d 639 [2003]).

Had the intent of the parties been to state or imply that the mediation process was confined to a single session on May 20, different language, such as "at a single one-day mediation session" could or should have been incorporated in the agreement; there is no such language here. The agreement did not state that the 40% fee vested if the case settled after the conclusion of the May 20 session. Rather, the agreement made a distinction between the fee due after a successful mediation and the fee due if the case was not resolved by mediation and Mr. Golomb had to prepare the case for trial, and to try it if necessary. In contrast, under the majority's view, even if the parties reached a monetary settlement on May 20, but loose ends remained that did not require the mediator's input or assistance to resolve, the matter would not be considered settled "at" mediation, and Mr. Golomb would be entitled to a 40% share, an absurd result.

The majority rejects this analysis, finding that it was Ms. Menkes's obligation to include language indicating that the mediation was an ongoing process and required to end before the 40% fee vested. However, this is what the first paragraph contemplated when it provided that Mr. Golomb would "provide whatever services are needed . . . to prepare [the file] for the mediation and to handle the mediation" in return for 12% of the net attorneys' fees, without limitation, and what the second paragraph contemplated when it obligated Mr. Golomb to prepare the case for trial and to try it if necessary as consideration for the increased fee.

Furthermore, an analysis of the language employed in the second paragraph does not support the majority's view. The term "presently scheduled for May 20, 2013," separated by commas, is a descriptive term, not one of limitation (*see Gravatt v General Star Indem. Co.*, 1998 WL 842351, *4 n 5, 1998 US Dist LEXIS 18827, *13 n 5 [SD NY, Dec. 2, 1998, No. 98-Civ-6670(RWS)] ["These commas indicate a non restrictive clause. Nonrestrictive clauses do not limit or define, but merely expand upon the meaning of the words to which they relate"]; *see also* Gertrude Block, *Language Tips*, 72 NY St BJ 54, 54 [June 2000] ["Commas enclose non-restrictive relative clauses; no commas are used around restrictive clauses"; non-restrictive clauses do not "define" the terms they follow, but merely add information]; *NACS v Board of Governors of Fed. Reserve Sys.*, 746 F3d 474, 487 [DC Cir 2014], *cert denied* 574 US —, 135 S Ct 1170 [2015]). Although the phrase identifies the start date of the mediation, it does not limit Mr. Golomb's responsibilities with respect to "the mediation" to that single date. Thus, when read as a whole, the agreement unambiguously provides for a 12% fee if the case resolves through the mediation and a 40% fee if the mediation was unsuccessful and the case has to proceed towards trial.

The majority states that this parsing of commas is an attempt to create an ambiguity where none exists. However, it is in fact a straightforward grammatical analysis of the language employed. As the court observed in *Massachusetts Mut. Life Ins. Co. v Aritech Corp.* (882 F Supp 190, 195 [D Mass 1995]): "The distinction may be analogized to the lessons everyone learned in junior high school about defining and non-defining relative clauses. Thus, the sentence 'Lawyers who are charlatans should be flogged' is quite different from the sentence 'Lawyers, who are charlatans, should be flogged.' In the first sentence the relative clause, not being set off with commas, *defines* a certain class of lawyers; the clause limits its antecedent. In the second sentence, because of the commas, the relative clause is merely descriptive, and all lawyers take a beating."

Here, as set forth above, the phrase "at the mediation, presently scheduled for May 20, 2013," is separated by commas, and the reference to the date is descriptive; it does nothing more than identify when the mediation is to commence.

The majority states that we should not review this argument because it is raised for the first time on appeal. However, Ms. Menkes did argue before the motion court that the reference to "at" the mediation did not state or imply that the mediation

process was confined to May 20. Moreover, the argument is properly considered because it involves a question of law appearing on the face of the record that could not have been avoided by Mr. Golomb if brought to his attention in a timely manner (*see Ellington v EMI Music Inc.*, 106 AD3d 401 [1st Dept 2013], *affd* 24 NY3d 239 [2014]).

Even if the phrasing in the parties' agreement is viewed as ambiguous, which it is not, an affirmation by David Brodsky, a professional mediator/arbitrator who specializes in complex commercial and financial disputes, was submitted by Ms. Mendes for the proposition that mediation is often a process that does not begin and end in a single day (*see also* Robin Gise, Jed Melnick, Vivien Shelanski & John Wilkinson, *Mediation Starts from the First Phone Call—Practice Pointers and Helpful Hints for Lawyers Going to Mediation*, 11 Cardozo J Conflict Resol 463, 475-476 [2010] ["Mediation is a process that may incorporate a day of face-to-face negotiations, and there may or may not be a settlement on that day. To suggest, however, that there is such a thing as 'after the mediation' is to force mediation into a 'one day' paradigm that undermines the true potential of mediation. Rather, a mediation starts the moment the first call comes in, and it should not end until the parties have put the dispute behind them"]).*

This view is consistent with the information provided on the JAMS website, which states, "Mediation is a process wherein the parties meet with a mutually selected impartial and neutral person who assists them in the negotiation of their differences" (JAMS Arbitration, Mediation, and ADR Services, Mediation Defined, http://www.jamsadr.com/mediation-defined). The JAMS Mediation Guide states, under "Follow Up," that "[i]n some cases, telephone conferences occur following mediation sessions if no agreement has yet been reached. Sometimes, further information is required for the process to continue or additional people may need to be involved in the decision making process" (JAMS Arbitration, Mediation, and ADR Services, JAMS Mediation Guide, http://www.jamsadr.com/mediation-guide/). Under "Agreement," the Guide states, "The mediator will work with counsel to finalize a settlement agreement and determine the procedures necessary for implementation. The mediator is available to provide assistance throughout the process" (http://www.jamsadr.com/mediation-guide/).

---

* Contrary to the majority's implication, this analysis is presented as an alternative grounds for reversing the award of a 40% fee, should the agreement be deemed ambiguous. My primary holding is that the agreement unambiguously entitles Mr. Golomb to only 12%, which does not rely on prohibited extrinsic evidence as the majority contends.

Although Mr. Golomb's performance was exemplary, and he diligently worked towards obtaining a settlement beneficial to plaintiffs, the trial court's interpretation would create a perverse incentive to avoid settling a case at mediation, even if the parties were close to agreement, where an attorney's retainer provided that he or she would receive a greater fee thereafter. It would also discourage the efforts of an outstanding mediator, such as the one the parties selected here, to continue his or her efforts where the parties were on the verge of reaching a settlement, even though a specific mediation session had ended.

The majority finds that the mediation ended on May 20 and that the fact that the mediator offered to reach out to the carriers to see if they would increase their offer thereafter is of no consequence. However, this interpretation again ignores that mediation is a process that often takes time to produce an agreement, especially where the case involves multiple responsible parties, complex injuries, and a large claim for damages. More importantly, it is not supported by the record, which demonstrates that further action by the mediator was expected when the May 20 session ended, and that the $8 million settlement was the direct result of the mediator's efforts.

As Supreme Court observed: "[c]o-defendant General Restoration Associates's counsel . . . avers, in his supplemental affirmation . . . that although [the parties] did not schedule another in-person session, he understood that the Mediator would continue efforts to bridge the gap after the May 20 session by contacting the excess carriers and plaintiffs' attorneys to continue negotiations" (42 Misc 3d 1227[A], 2014 NY Slip Op 50206[U], *8 [Sup Ct, NY County 2014]).

Consistent with this statement, emails between Mr. Golomb and Ms. Menkes demonstrate that Mr. Golomb was still negotiating with the mediator after May 20.

In an email dated May 21 addressing plaintiffs' "WC [Workers' Compensation] situation," Mr. Golomb advised Ms. Menkes, "For now, if we can come to agreement via [the mediator] on the number, we can say subject to approval by WC and approval by clients."

In an email dated May 22, Mr. Golomb advised Ms. Menkes, "[The mediator] has not yet called back." In another email that day, Mr. Golomb advised Ms. Menkes that the mediator had called back and "hasn't heard from the excess people and is going to reach out to them [and] hopes to get back to me by Friday." The mediator also advised Mr. Golomb that the Workers' Compensation lien could be negotiated. In an email dated

May 28, Ms. Menkes asked if there was any news and if "we should say that if we do not settle by a certain date we will not accept settlement and will be prepared to let the jury decide the value of the case." Later that day, Mr. Golomb replied that he had gotten a text from the mediator that morning, who said he would try to contact the excess carrier that day and would let Mr. Golomb know what happened. Three days later, on May 31, the mediator conveyed the $8 million offer to Mr. Golomb, which plaintiffs accepted.

Mr. Golomb also acknowledged at oral argument on the motions that at the close of the mediation there was an expression of hope by the mediator that the gap between the parties would be closed. Mr. Golomb explained: "He gave me the card for the Zurich excess—the RSUI excess representative. He gave her my card. He expressed the hope that we would remain in touch because the only way the case was going to settle was, (a), if I could get a greater than statutory one-third reduction of the comp lien which I hoped to and, (b) if one or both of the excess carriers would put a substantial amount, at least a million dollars, if not more, on the case."

Mr. Golomb further acknowledged that after the May 20 session, he had further conversations with the mediator and with the structured settlement brokers and defense counsel. Mr. Golomb admitted that he ultimately agreed to the $8 million figure with the mediator, who was involved when all the parties locked in the number, after which he and defense counsel worked out the terms of the structured settlement and the release on their own. During this entire 10-day period, Mr. Golomb and Ms. Menkes took no steps to prepare the case for trial and were merely awaiting news of the mediator's progress with the excess carrier in anticipation of settlement. That the parties came to an agreement on the details of the structured settlement and release, including the issues arising from plaintiffs' receipt of Workers' Compensation benefits, without needing the assistance of the mediator, does not alter the fact that the offer of $8,000,000 and the acceptance of that figure was accomplished through the mediator.

On this record, the fact that the mediator, whether to generate good will or otherwise, chose to bill for only five hours is inconsequential. The fact that it took 11 days to reach a settlement merely demonstrates the extent of the mediator's continued involvement and efforts to resolve the case. While the majority believes that Mr. Golomb should be rewarded because he took the lead at the mediation and in the follow-up negotiations, that is what he agreed to do for 12% of the net attorneys' fees.

Accordingly, I would award Mr. Golomb 12% of the net attorneys fees.